# United States Court of Appeals
## For the First Circuit

---

Nos. 09-2094,
     09-2211,
     09-2285,
     09-2376,
     09-2461,

UNITED STATES OF AMERICA,

Appellee,

v.

VÍCTOR GERARDO CORTÉS-CABÁN,
PASCUAL SANTIAGO-MÉNDEZ,
LUIS ENRIQUE RUPERTO-TORRES,
ANTHONY DOMÍNGUEZ-COLÓN, and
VÍCTOR GERARDO CORTÉS-CABÁN,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

---

Ramón García-García, for appellant Cortés-Cabán.
Ernesto Hernández-Milán, for appellant Santiago-Méndez.
Nicolás Nogueras-Cartagena, for appellant Ruperto-Torres.
Lydia Lizarríbar-Masini, for appellant Domínguez-Colón.
Scott H. Anderson, Assistant United States Attorney, with whom
Rosa Emilia Rodríguez-Velez, United States Attorney, Julia M.
Meconiates, Assistant United States Attorney, and Nelson Pérez-
Sosa, Assistant United States Attorney, Chief, Appellate Division,

were on brief for appellee.

_____

August 10, 2012

_____

**TORRUELLA, <u>Circuit Judge</u>, opinion of the court except as to Part II.B, Part II.C.1, and Part II.C.2; Dissenting in Part II.B, Part II.C.1, and Part II.C.2.[1]**

"Quis custodiet ipsos custodes?"[2]

We are presented with highly troubling instances of abuses of police power, including the disturbing practice, conducted by certain members of the Mayagüez Drugs and Narcotics Division of the Puerto Rico Police Department, of planting evidence and conducting illegal searches and seizures in violation of the Fourth Amendment.

Defendants-Appellants Pascual Santiago-Méndez ("Santiago"), Anthony Domínguez-Colón ("Domínguez"), Victor Cortés-Caban ("Cortés"), and Luis Enrique Ruperto-Torres ("Ruperto"), all police officers in the Puerto Rico Police Department, were charged in a two-count indictment for (1) conspiring to injure, oppress, threaten, and intimidate persons in the town of Mayagüez in the free exercise or enjoyment of their constitutional rights in violation of 18 U.S.C. § 241, and (2) conspiring to possess with intent to distribute controlled substances in violation of 21

---

[1]  Chief Judge Lynch writes the opinion of the court as to the issues considered in Part II.B, Part II.C.1, and Part II.C.2, which Judge Stahl joins. <u>See</u> <u>infra</u>.

[2]  This expression is most commonly translated as, "Who watches the watchmen?" Juvenal, <u>Satires</u>, "Satire VI: The Decay of Feminine Virtue."

-3-

U.S.C. §§ 841(a)(1) & 846.[3]  Following their jury trial, all appellants were convicted of count one, with Santiago, Cortés, and Domínguez also being convicted of count two.

All appellants challenge their convictions, asserting that the government failed to present sufficient evidence showing a violation of either 18 U.S.C. § 241 or 21 U.S.C. §§ 841(a)(1) & 846.[4]  Additionally, Santiago, Domínguez, and Ruperto raise distinct challenges to their sentences.

In brief, we affirm all appellants' convictions as to count one.  As to the convictions under count two for alleged conspiracy to possess with intent to distribute controlled substances, we are presented with a matter of first impression. And it is here that I part company with my colleagues, who affirm the convictions of Santiago, Cortés, and Domínguez as to count two and conclude that the government's evidence satisfies the legal requisites for a conviction of conspiracy to posses with intent to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and 846.  I respectfully dissent from my colleagues' holding in this respect for the reasons set forth infra.

---

[3]  In total, ten defendants were indicted for their roles in the charged conspiracies.  We limit our discussion to those appellants presently before us.

[4]  Because Ruperto only was convicted of count one, he limits his conviction challenge to whether the government met its burden of showing his involvement in a conspiracy pursuant to 18 U.S.C. § 241.

The evidence supporting the convictions as to both count one (conspiracy to violate civil rights) and count two (conspiracy to possess controlled substances with intent to distribute) is substantially the same and is sufficient to permit the jury to conclude beyond a reasonable doubt the following facts.

## I.  **The Facts**

### A.  The Black Box and the Nefarious Use of its Contents by Certain Police Officers

The underlying criminal acts at issue in this case may be traced back -- like so many Pandora-released evils -- to a box.

Appellants, members of the Puerto Rico Police Department's Mayagüez Drugs and Narcotics Division (the "Division"), were convicted of fabricating criminal cases against citizens through the planting of controlled substances, leading to such citizens' wrongful arrests based on the fabricated evidence. Several appellants asserted that this was done to meet a department-required weekly quota of arrests.[5]

From 2005 to 2007, Lieutenant Dennis Muñiz ("Muñiz") served as the director of the Division.  He participated and

---

[5]  The Division had a quota of arrests that officers were required to complete every week.  If officers failed to satisfy the Division's quota they could face administrative repercussions, such as a change in position.  The government challenges appellants' contentions that their actions were motivated by any such quota, noting that in certain instances, Division members exacted a personal vendetta against particular "marks" through case fabrication.  Appellants' motivation in this particular respect is immaterial to establishing the illegality of their actions.

assisted in overseeing this fabrication practice.  At trial, Muñiz, testifying as a government witness, stated that the drugs used by the officers for purposes of fabrication typically were stored in a metal black box that generally was under the care and custody of Santiago, a supervisor in the Division.  It was Santiago's practice to store the box in a file cabinet in his office.  The box contained a mélange of contraband, including crack, cocaine, heroin, aluminum strips, drug paraphernalia, and ammunition rounds.  Such contraband was given to agents prior to their execution of a search warrant or other intervention to ensure that an arrest would ensue.  Testimony at trial confirmed that Muñiz and Santiago specifically instructed officers to plant drugs if a search or intervention was not "positive," i.e., did not produce valid grounds for arrest.[6]

The following acts of fabrication were established beyond a reasonable doubt.[7]

---

[6]  Officers repeatedly used the term, "positive," to refer to a search that had to produce grounds for an arrest, such as the discovery of contraband or other illegal material. We use the term in like fashion throughout this opinion.

[7]  We acknowledge at the outset that the record does not show the subsequent consequences or ramifications for those citizens implicated in the described fabricated cases and false arrests, nor does it specifically confirm the charges for which the various arrestees were processed. Where such information is available in the record, it is so noted.

### 1. The Stolen Car Incident

Muñiz testified that sometime during his tenure as director of the Division, his daughter called him to report that her car had been stolen. Muñiz stated that he immediately contacted Santiago to help investigate the matter and locate the vehicle while he drove to meet his daughter. Meanwhile, Santiago recruited agents Luis Vélez ("Vélez") and Domínguez to assist. Soon after, Santiago called Muñiz to inform him that they not only had located his daughter's car, but also had arrested three minors whom they were taking to the Division in Mayagüez. Muñiz quickly altered his course to drive to the Division, confirm ownership of the vehicle, and observe the detained youths. On arriving at the Division, Muñiz recognized his daughter's car. When he spoke with Santiago, Santiago informed him that he had fabricated a case against the minors, charging them with possession of controlled substances even though no drugs had been found on them at the time of arrest or processing. The arrested minors were processed for possession of controlled substances and robbery of the vehicle, ultimately pleading guilty to both counts. Of course, only the car robbery charge was properly supported by legal evidence.

### 2. The Search of "El Monstruo's" Home

Around the end of 2006 and early 2007, officers conducted a search of the residence of José "El Monstruo."[8] Before leaving the Division to assist with the search, Santiago handed Agent Vélez a small bag containing marijuana and cocaine. Santiago, speaking on behalf of himself and Muñiz, instructed Vélez to "wait for their call" before taking any action, and advised Vélez that the search had to be "positive." Vélez, also testifying for the government, indicated that he only abided by the second part of the instruction, taking it upon himself to plant the drugs in a closet next to the bathroom upon entering the premises without waiting for Santiago or Muñiz's go-ahead. Vélez also testified that he received numerous calls from both Santiago and Muñiz during the search, in which they repeatedly stressed that the search had to be "positive." During one such call, Vélez stated that he told them "the job had been done" and to "take it easy." Two individuals present at the residence were arrested as a result of the search and charged with illegal possession of controlled substances.

### 3. The Monte Isleño Search

In early 2007, Vélez was sent out to conduct another search and seizure operation, this time in the Monte Isleño housing project, the situs of an ongoing drug investigation with various

---

[8] The record does not establish the full name of José, a/k/a "El Monstruo." As can be discerned, "El Monstruo" means "The Monster" in the Spanish language.

search and seizure orders.  Santiago again gave Vélez a bag of contraband, this time containing crack, and instructed him to make sure the search turned out positive.  On arriving at the premises, Vélez observed two detained individuals and proceeded to the interior of the residence; he planted the drugs in a bureau drawer located on the second floor and exited the home.  Officers subsequently arrested the detained individuals based on the planted evidence.

### 4.  The Man Who Swallowed Marijuana

Also in early 2007, agents Santiago, Vélez, and Domínguez were conducting a "preventive round" in an unmarked civilian vehicle in the area of Quinto Centenario under Muñiz's supervision.[9]  While patrolling, the officers observed a group of people gathering under a tree.  When the group spotted the police officers' presence in the vehicle, one individual fled, which prompted Domínguez and Vélez to immediately exit the car and give chase.  The chase was short-lived, as the individual tripped on his sandals and fell.  The officers detained the individual and proceeded to search and question him.  The search revealed no contraband on his person, but upon questioning by Vélez the suspect admitted to having swallowed marijuana before the police caught up to him.  Vélez testified that he noticed the smell of marijuana on

---

[9]  Testimony at trial clarified that a "preventive round" occurs when officers patrol to maintain security and inhibit the occurrence of crime through their presence.

the man's breath. The officers proceeded to arrest the subject and to take him to the police station for processing where he was charged with possession of cocaine, despite the fact that cocaine was not found in his possession.

### 5. The "Planting" at the Puchi Residence

In approximately February or March 2007, agents in the Division prepared for a search and seizure operation targeting a known drug leader's home, Omayra Segarra, also known as "Puchi." Vélez was to be one of the participating agents. Santiago, frustrated with Puchi's lack of cooperation in providing the Division with information, decided to "fix" the search. Santiago, as had been done on previous occasions, advised Vélez that the search had to be "positive" and handed him several baggies containing marijuana and cocaine. Additionally, Santiago gave him specific instructions to plant the drugs in both Puchi's home and in her car.

Various officers, including Cortés, traveled with Vélez to Puchi's residence. Upon arrival, the officers, including Vélez, entered the residence. Vélez walked to a room and planted a bag containing cocaine on a shelf in the closet. He then exited the residence while the other officers continued the search of the home, eventually coming upon the planted evidence. While standing outside the residence, Vélez received a phone call from Santiago, who was en route to Puchi's place, seeking an update on the Puchi

-10-

search. Vélez informed him that the "job up in the residence was done," but that "the one in [Puchi's car] was still not so."

Soon after, Santiago arrived and obtained the keys to Puchi's vehicle from Agent Cortés, who was still inside the home conducting the search. Santiago opened Puchi's car's passenger door and instructed Vélez to plant the marijuana in the vehicle, which he did. Cortés then arrived with a drug canine, which quickly detected the planted marijuana. Puchi and her husband were arrested for possession of the planted controlled substances.

**6. The Columbus Landing Episode**

Following Puchi's arrest, the agents returned to the Division. Some agents worked on the processing of the Puchi-residence arrestees, while others left to get breakfast. The remaining agents, including Vélez, waited to execute other outstanding search and seizure orders. One of these orders included a search at the Columbus Landing housing project.

Vélez left the Division together with Santiago in a police vehicle, while other officers traveled to the project separately. Vélez testified that when he and Santiago arrived at the search location, Santiago handed him a brown paper bag containing baggies of cocaine. Santiago advised Vélez that the search had to be "positive." Vélez testified that he felt "uncomfortable" with Santiago's instructions, and told him that "this had to come to an end, that this manner of working could not

-11-

continue." Vélez then entered the home, placed the paper bag containing the cocaine baggies on top of a bureau in a bedroom, and exited the room.

On leaving the room, Vélez said he saw that the other assisting officers already had placed two of the home's residents under arrest for legitimately-discovered -- i.e., not planted -- controlled substances. Santiago, observing the same, instructed Vélez to retrieve the planted paper bag from the bedroom. Vélez complied and hid the bag inside his bulletproof vest pocket. Once Santiago and Vélez had reached their police vehicle, Vélez testified that he threw the drug bag into the private confines of the car and told Santiago, "This can't go on. This isn't going to happen again." But like many other plans of mice and men, this was not to be.

Vélez participated in yet another search operation later that same day, also at the Columbus Landing housing project, planting the same bag retrieved from the previous operation in a pile of men's shoes in the targeted residence, again pursuant to Muñiz's instructions. The planted evidence was again the basis for the arrest of the Columbus Landing resident.

### 7. Bosques' Revenge

In July 2007, Santiago received a phone call from Agent José Bosques ("Bosques"), who by that time was cooperating with the

Federal Bureau of Investigation ("FBI").[10] Bosques told Santiago he needed drugs to fabricate a case against his neighbors, and told him he was going to the Division to obtain some from their stash. Santiago informed Bosques that he had left their cache with Vélez, but that he could take whatever he wanted. Bosques then called Vélez. Vélez was not at the office, but said the black box was. After speaking with Vélez, Bosques again contacted Santiago, informing him of his predicament. Santiago suggested that Bosques contact Agent Bey to see if he could provide him with the drugs, and Santiago did so. He explained to Bey why he wanted the drugs and requested a few bags of marijuana and cocaine. Bey initially told Bosques that he would look into it; however, when Bosques called Bey again while en route to the Division, Bey said he was no longer there, but that he had left the drugs with Domínguez.

When Bosques arrived, Domínguez had them go to the restroom. He then handed Bosques a clear plastic bag containing a small amount of the requested cocaine and marijuana. Upon seeing the small amount of drugs, Bosques asked Domínguez for rounds of ammunition that he could plant in addition to the drugs. Domínguez became suspicious of the request and asked Bosques if he was "wired," trying to lift up Bosques's shirt to confirm his

---

[10] The exact date when Agent Bosques first began cooperating with the FBI is not clear from the record. What is clear, however, is that Bosques often wore a concealed recording device to document his interactions with the conspiring officers.

suspicions. Bosques literally dodged the question and moved out of Domínguez's prying reach; he picked up his bulletproof vest, which was lying nearby, and held it against his body to avoid Domínguez's inquisitive hands. Domínguez was taken in by this ruse and desisted in his attempt to pat Bosques down, instead giving Bosques the requested rounds. Bosques then left the premises, thereafter handing the drugs, ammunition, and recording equipment to the FBI.

**8. Going to the Dogs**

Also in July 2007, civilian Wilfredo Henríquez Pérez ("Henríquez") arrived home from work and, as was his custom, left to walk his dog. While walking his dog, Henríquez spotted an individual dressed in civilian clothes running towards him brandishing a weapon in his hand. Unbeknownst to Henríquez, the individual was a police officer, Agent Domínguez, to be precise. Domínguez detained Henríquez, hitting him twice on the side of the head. Domínguez then patted Henríquez down, finding five dollars on his person. He arrested him and placed him in a police car.

Henríquez repeatedly asked Domínguez why he was under arrest, but to no avail. Upon arriving at the police station, Henríquez was placed in an office while Domínguez spoke to Vélez. Domínguez then requested two bags of drugs from Vélez. On receiving them, he reentered the office in which Henríquez had been detained, gestured to the bags, and told Henríquez, "this is what I got from you, what I seized from you, . . . [i]f you help me,

I'll help you." Domínguez, apparently unsatisfied with Henríquez's response, decided to release Henríquez soon after. He was about to do so when Henríquez's neighbor, Pita Martí ("Martí"), an attorney, arrived at the station. Martí stated that he had witnessed the entire incident of Henríquez's arrest, and that at no time did he see Domínguez seize any drugs from Henríquez. A brief confrontation ensued, causing Domínguez to take Henríquez back inside the station, thereby prolonging his detainment. Later that evening, Henríquez was released. No formal drug possession charges were ever filed against him.

### 9. Confessions in an Unmarked Police Car

In mid-July 2007, Agents Bosques and Cortés, investigating two individuals named Corinna and Bachan, went on a surveillance assignment in an unmarked police car. The agents observed Corinna leave a house in a car and followed him in their vehicle for a brief period. Despite not observing any illegal acts on Corinna's part during that time, Bosques testified that Cortés told him "he would 'dress' [Corrina] up himself." Bosques stated he interpreted Cortés' statement to mean that, when drafting his sworn statement for a search warrant, Cortés would craft the facts in such a manner that they would support the issuance of a warrant.

Also while patrolling, Bosques testified that Cortés spoke to him about a previous arrest, to which he admitted to fabricating the facts. Soon after their surveillance session,

Bosques assisted Cortés in drafting a sworn affidavit -- containing false information describing events that never took place -- to obtain a search warrant against Bachan and Corrina.

### 10. "Dealing With It" at the El Carmen Housing Project

Bosques went on another surveillance assignment with Agent Ruperto, also in mid-July. Ruperto, one of the higher-ranking officers in the operation, instructed Bosques that he wanted to complete eight arrests that day to satisfy their quota. They then traveled to the El Carmen housing project, as Bosques testified, "to intervene with any person who was committing any type of violation against the controlled substances law."

The plan for the operation was for Bosques, Cortés, and other participating agents to interview various confirmed drug users and record their names and personal information under the guise of locating a drug rehabilitation program for them. This explanation, in fact, was a ploy for the agents' ongoing practice of inputting such information to generate false arrest reports.

While patrolling, Ruperto told Bosques that he expected him "to catch a motherfucker who's full of drugs." When Bosques asked what he should do if he seized an individual with no drugs on his person, Ruperto replied, "[y]ou have to deal with that." Bosques reminded Ruperto that he was "in zero," meaning he had just returned from vacation, and thus, had no drugs or substances with which to fabricate a case or an arrest. Ruperto and Bosques

-16-

continued patrolling and passed the same area in which Domínguez had chased down and arrested Henríquez. Ruperto, remembering the incident, began laughing and remarked, "[Domínguez] did what he had to do." When Henríquez, by chance, passed by their surveillance point, Ruperto, recognizing him, said, "Look at Flaco, where we arrested him."[11]

### 11. The Unraveling of the Conspiracy to Fabricate Criminal Cases and the Search for the Black Box

On July 17, 2007, FBI agents Edwin Dorsey ("Dorsey") and Julio Tobar ("Tobar") approached Cortés as he exited a local courthouse. The federal agents told Cortés that they wanted to speak with him regarding the suspected fabrication of cases occurring in his unit at the time, as well as both his and his officers' participation in such activity. The federal agents invited Cortés into their vehicle for a more private conversation. Federal agent Tobar then stated that he knew Cortés had in his possession at that time two affidavits containing false information that he had authenticated in court. After Tobar read Cortés his rights, Cortés admitted the falsity of the affidavits and confirmed his involvement in the fabrication of other cases in his unit.

Following their conversation, Dorsey and Tobar sought and executed a search warrant to locate and seize the infamous black box containing the contraband. The subsequent search of the drug

---

[11] At trial, Bosques explained that Ruperto's reference to "Flaco" was his means of referring to Henríquez.

unit's premises concluded with the agents' finding the box in Vélez's desk. They also discovered more controlled substances in a locker inside the unit's premises.

While the FBI agents were executing the warrant, Division officers, including Bosques, Santiago,[12] Ruperto, and Vélez, met outside the building to try to concoct an alibi justifying their possession of various contraband and the black box. A potential plan was to inform the federal agents that the black box had been seized during a search of a housing project. The Division officers met again several days later to discuss the FBI search and confirm their stories. Santiago instructed Vélez to prepare a report, explaining that the black box had been seized during a search of a housing project following a confidential phone call, but that, due to excessive work, he had been unable to draft the report sooner.

On July 21, 2007, Cortés and federal agent Tobar met again. During their meeting, and after Tobar had read Cortés his rights, Cortés admitted that he had participated in the planting of evidence in several of the fabricated cases, listing approximately ten to fifteen instances when he had done so. Cortés additionally admitted to planting evidence approximately twenty times and to executing approximately seventy search warrants containing some

---

[12] Agent Santiago had recently returned from vacationing in the Dominican Republic, arriving the day of the FBI's search of the Division. Testimony at trial established that Santiago had given the black box to Vélez prior to his vacation.

-18-

degree of false information. Cortés confirmed that during a search of a housing project, he, along with other agents, had gathered information from drug users under the pretense of finding them a rehabilitation program, when in fact the agents were using such data to generate false arrest reports. Lastly, Cortés admitted to giving drugs to Bosques so that he could use them to plant evidence in support of fabricated cases.

On August 23, 2007, a grand jury issued a two-count indictment in the District of Puerto Rico, charging appellants with conspiracy to violate civil rights under 18 U.S.C. § 241, and conspiracy to possess controlled substances with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 846. Following trial, the jury rendered a verdict, convicting Santiago, Cortés, and Domínguez of both counts and Ruperto, only of count one. The district court subsequently denied appellants' Rule 29 motions for a judgment of acquittal and sentenced them to differing terms of imprisonment. This appeal followed.

## II. Discussion

All appellants challenge their convictions as to count one, with Cortés, Domínguez, and Santiago also challenging their count two convictions.

The standards of review applicable to the issues before us are well-settled. We review a district court's Rule 29 determination de novo. United States v. Hernández, 218 F.3d 58, 64

(1st Cir. 2000).  Our case law also clearly holds that a review of a court's denial of a motion for acquittal "is quite limited; we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt."  Id. (quoting United States v. Paradis, 802 F.2d 553, 559 (1st Cir. 1986)) (internal quotation mark omitted).  This standard of review is "formidable, and defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Rivera-Rodríquez, 617 F.3d 581, 596 (1st Cir. 2010) (quoting United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008)) (internal quotation marks omitted). In assessing appellants' sufficiency of the evidence challenge, we place "no premium . . . upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

A.  Conspiracy pursuant to 18 U.S.C. § 241

Appellants argue that the government failed to present sufficient evidence showing (1) their respective involvement in or agreement to join the § 241 conspiracy, or (2) any specific intent on each of their parts to so violate citizens' rights.[13]

---

[13]  In contesting the sufficiency of the evidence supporting their count one convictions, appellants raise the following additional arguments unique to their respective appeals.

Santiago contends that the government did not identify nor

-20-

present testimony from a victim whose rights actually were harmed by Santiago. Moreover, Henríquez, the only witness-victim whom the government did offer, identified Domínguez and Cortés as his perpetrators and misidentified one of the conspirators at trial, weakening his credibility.

Domínguez argues that the specific instances for which the government offered evidence in support of appellants' alleged violations did not prove the occurrence of unlawful arrests; rather, the evidence showed that "there was founded reason to believe that [the arrested] individuals had engaged in unlawful conduct." Further, Domínguez contends that in none of the alleged incidents was he specifically identified to have been carrying or planting baggies of drugs. Lastly, even if any of the alleged conspiratorial acts in fact occurred, Domínguez asserts that such actions were carried out pursuant to superiors' orders, weighing against a finding of liability as to count one.

Ruperto likewise argues that the evidence offered at trial showed, at most, that any actions undertaken on his part were performed pursuant to superiors' orders. Moreover, testimony at trial confirmed that any interventions in which he participated were legitimate. No evidence showed Ruperto had any knowledge as to other officers' planting of false evidence; that he ever asked or ordered another officer to fabricate a case; or that he himself so planted evidence.

Ruperto also notes that he only was convicted of the count one conspiracy, but not of the count two conspiracy. Ruperto contends the only evidence presented as to count one turned on the same wrongdoing -- appellants' alleged use of illegal drugs to fabricate cases -- supporting his co-appellants' convictions as to count two. Because he was acquitted of "all wrong-doing related to the drug [distribution] conspiracy," and because the government failed to produce other evidence showing a violation of citizens' rights, Ruperto argues that his conviction under count one cannot stand.

These arguments were incorporated into appellants' overall sufficiency of the evidence challenges to their count one convictions, which we reject for the reasons stated herein. Regarding Domínguez and Ruperto's "following orders" defense, we reject the validity of a so-called Nuremberg defense. Cf. Judgment of the Tribunal, Trial of Wilhelm von Leeb and Thirteen Others, 12 Law Reports of Trials of War Criminals 1, 71-72 (United States War Crimes Commission 1949) (noting "[t]he fact that any person acted pursuant to the order of his Government or of a superior does not

### 1. Standard of Review and Applicable Law

A conspiracy pursuant to 18 U.S.C. § 241 exists where "two or more persons conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States . . . ." 18 U.S.C. § 241. Thus, to convict for such a conspiracy, the government must establish that defendants "1) conspired to injure, oppress, threaten, or intimidate one or more of the victims, 2) with the intent to interfere with the victim's due process rights, 3) under color of state law." United States v. Guidry, 456 F.3d 493, 507 (5th Cir. 2006); see also 18 U.S.C. § 241; United States v. Vaden, 912 F.2d 780, 781 (5th Cir. 1990).

Additionally, because the normal rules for proving a conspiracy apply, the government must show that "(1) a conspiracy existed, (2) the defendants had knowledge of the conspiracy, and (3) the defendants voluntarily participated in the conspiracy." United States v. Rodríguez-Ortiz, 455 F.3d 18, 22 (1st Cir. 2006). Direct or circumstantial evidence will suffice to establish each of these elements. Id. We note that an alleged conspirator's agreement to participate in a conspiracy "need not be express." United States v. Lizardo, 445 F.3d 73, 81 (1st Cir. 2006). Moreover, "each coconspirator need not know of or have contact with

free him from responsibility for a crime").

-22-

all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." United States v. Martínez-Medina, 279 F.3d 105, 113 (1st Cir. 2002).

Because the facts in this case amply support the determination that a rational trier of fact could have found, beyond a reasonable doubt, that appellants, acting under color of state law, conspired to violate various Mayagüez residents' rights, we reject appellants' arguments as to their count one conviction.

### 2. Analysis

#### a. Sufficiency of the Evidence

Three cooperating co-conspirators testified, including Muñiz, the Division's director from 2005 until the date of arrest, and Vélez and Bosques, officers in the Division. We repeatedly have held that "the uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible." United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir. 2000) (emphasis added); United States v. Rosario-Díaz, 202 F.3d 54, 67 (1st Cir. 2000); United States v. Andújar, 49 F.3d 16, 21 (1st Cir. 1995); United States v. Gómez-Pabón, 911 F.2d 847, 853 (1st Cir. 1990). Here, we have the corroborated testimonies of three cooperating witnesses, each of which could allow a jury to reasonably infer that appellants were actively involved in the count one conspiracy. Muñiz, Bosques, and

-23-

Vélez's testimonies repeatedly established appellants' voluntary participation in an unlawful scheme to fabricate cases and violate citizens' constitutional rights. Each provided a detailed overview of the Division's practice of fabricating cases by planting evidence and falsifying arrest reports. They repeatedly identified active participants, which included appellants, and confirmed one another's respective testimonies.

The three officers explained that agents generally met at the Division before executing a search warrant or performing other forms of police intervention, at which times Santiago would hand out contraband to agents with instructions to plant evidence to prevent a "negative" search. They described the black box and its location in the office, as well as the source and nature of its contents. Additionally, they specifically detailed various incidents in which Santiago and Muñiz provided officers with drugs to plant evidence to ensure a positive result and to the subsequent consequences of such actions to the citizens in question.[14]

Moreover, none of the witnesses' respective testimonies was facially incredible. Torres-Galindo, 206 F.3d at 140; Rosario-Díaz, 202 F.3d at 67. Their respective testimonies were vindicatory of the others; defense counsel zealously challenged each witness' credibility throughout trial; and both sides highlighted the witnesses' participation in the crimes committed

---

[14]  See supra Part I.A.

for the jury's consideration.  The credibility and weight to be given to the testimony of these witnesses were classical issues for the jury.

Even if it could plausibly be argued that the testimonies of Muñiz, Bosques, and Vélez were not sufficient to sustain the jury's determination -- a conclusion that is unsupportable on this record -- the government also introduced a series of audio and video recordings that corroborated the witnesses' testimonies and further insulated the conclusion that they conspired to deprive citizens of their constitutional rights.[15]

Appellants' arguments do little to persuade us that the corroborated and detailed evidence presented at trial was so insubstantial or incredible that the jury's convictions could not be supported by the weight of the evidence.  At most, appellants' challenges address whether the government satisfied its evidentiary burden of establishing their involvement in a conspiracy to violate constitutional rights.  However, the case law makes clear that a conspirator's agreement to participate "need not be express, [and] may consist of no more than a tacit understanding," United States v. Echeverri, 982 F.2d 675, 679 (1st Cir. 1993) (quoting United States v. Glover, 814 F.2d 15, 16 (1st Cir. 1987)) (internal quotation marks omitted); "[t]here is no need for a conspirator to know the other participants in the conspiracy," United States v.

_____

[15]  See supra Part I.A.

Rivera-Ruiz, 244 F.3d 263, 268 (1st Cir. 2001); "the government need not prove that the defendant[s] knew all the details . . . of the conspiracy," United States v. Nueva, 979 F.2d 880, 884 (1st Cir. 1992); a conspirator does not have to "realize the full extent of the conspiracy to be found guilty," Rivera-Ruiz, 244 F.3d at 268; and specific intent may be established through circumstantial evidence alone. United States v. Donato-Morales, 382 F.3d 42, 47 (1st Cir. 2004).

Here, the evidence established that various identified officers in the Division (including appellants) met with one another and received contraband with specific instructions to fabricate cases. These officers accepted the contraband and participated in several incidents of planting to ensure positive results. Additionally, the record shows the officers were cognizant of their co-conspirators' identities, participated in nefarious activities with knowledge as to their illegal object, and understood the overall purpose of the conspiracy. In fact, the evidence establishes that the conspirators often discussed their case-fabrication experiences amongst themselves, and in the last stages of the conspiracy, met to concoct an alibi to explain their possession of the black box and its contraband contents to the investigating authorities that were closing in on them.

The government's evidence as to count one overwhelmingly clears the requisite evidentiary bar.  We thus affirm appellants' convictions as to the count one conspiracy.

### b.  Ruperto's Inconsistent Verdicts Argument

Ruperto raises the separate argument that the jury verdict as to him was unreasonable because he was acquitted of count two, but convicted under count one.  He contends that the count one conspiracy involved the fabrication of cases that turned on the conspirators' intent to use drugs for planting, the latter of which was targeted under count two's charge.  We reject Ruperto's argument.

Case law is clear that "verdicts are not inconsistent if the elements of the two charged counts are not identical." United States v. Berbere, 229 F.3d 1134, 2000 WL 1160439, at *1 (1st Cir. 2000) (unpublished table decision) (emphasis added).  The elements of the charges in counts one (conspiracy to violate citizens' constitutional rights) and two (conspiracy to possess with intent to distribute a controlled substance) are different: one is a violation of rights charge and the other a drug distribution charge.  Even if the verdicts could somehow be deemed inconsistent, "the Supreme Court has made it clear that verdict inconsistency in itself is not a sufficient basis for vacating a conviction," United States v. López, 944 F.2d 33, 41 (1st Cir. 1991), provided that "the appellate court is satisfied that there was sufficient

-27-

evidence to sustain the counts of conviction." <u>United States</u> v. <u>Sullivan</u>, 85 F.3d 743, 747 (1st Cir. 1996). Here the evidence, in the form of various cooperating witnesses' testimonies and audio and video recordings, was sufficient to show that Ruperto conspired with his co-conspirators to violate individuals' rights. It is not our role to "weigh[] the credibility of the witnesses nor attempt[] to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." <u>Berbere</u>, 229 F.3d at 1134, 2000 WL 1160439, at *1 (quoting <u>United States</u> v. <u>Noah</u>, 130 F.3d 490, 494 (1st Cir. 1997)). Because the evidence supports the jury's conviction as to count one, we reject Ruperto's challenge and affirm his count one conviction.

**B. Conspiracy Pursuant to 21 U.S.C. §§ 841(a)(1) & 846**

Santiago, Cortés, and Domínguez argue that the evidence was insufficient to convict them of conspiring to possess controlled substances with an intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 846. Cortés and Domínguez further state, but do not develop an argument, that a conspiracy by law enforcement officers to plant controlled substances on victims in order to fabricate criminal cases does not entail the specific intent to distribute within the meaning of § 841(a)(1). We disagree. Because the express language of the statute encompasses defendants' conduct, and there is no expression of contrary intent,

and because the evidence amply supports the verdict, we affirm their conviction under count two.

Our review of the district court's Rule 29 determinations is <u>de novo</u>. <u>Hernández</u>, 218 F.3d at 64. "However, our review of the district court's decision to deny a motion for acquittal is quite limited; we must affirm unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt." <u>Id.</u> (quoting <u>Paradis</u>, 802 F.2d at 559) (internal quotation marks omitted). In applying this standard, "no premium is placed upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." <u>Id.</u> (quoting <u>Ortiz</u>, 966 F.2d at 711) (internal quotation marks omitted). Nor may we weigh the evidence or make credibility judgments, as these tasks are reserved to the jury. <u>Id.</u> Instead, we "must uphold any verdict that is 'supported by a plausible rendition of the record.'" <u>Id.</u> (quoting <u>Ortiz</u>, 966 F.2d at 711).

"As with any question of statutory interpretation, our analysis begins with the plain language of the statute." <u>Jimenez</u> v. <u>Quarterman</u>, 555 U.S. 113, 118 (2009); <u>see also</u> <u>Recovery Grp., Inc.</u> v. <u>Comm'r</u>, 652 F.3d 122, 125 (1st Cir. 2011). The Controlled Substances Act, as codified at 21 U.S.C. § 841(a)(1), makes it "unlawful for any person [to] knowingly or intentionally . . . manufacture, distribute, or dispense, or possess with intent to

manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Section 846, in turn, provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Id. § 846.[16]

Under the plain language of § 841(a)(1), a prima facie case of possession with intent to distribute requires a showing that the defendant (1) knowingly and intentionally possessed; (2) a controlled substance; (3) with the specific intent to distribute. United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007).

It is the third element, specific intent to distribute, with which defendants take issue. Specific intent requires a showing that the defendant intended the proscribed outcome as his purpose. United States v. Dyer, 589 F.3d 520, 528 (1st Cir. 2009). This raises two related issues: what constitutes "distribution" within the meaning of the statute, and, given the meaning of that

---

[16] As previously discussed in the review of count one, to prove a conspiracy the government must show "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy," Gómez-Pabón, 911 F.2d at 852, with "voluntary participation" constituting an "intent to agree to the conspiracy and [an] intent to effectuate the object of the conspiracy," United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004). The defendant's voluntary participation may be proved either by direct or circumstantial evidence. See United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989).

term, whether the conspirators had the requisite specific intent to distribute required by the statute.

### 1.  The Meaning of "Distribute"

The term "distribute" is defined under the Controlled Substances Act as "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical."  21 U.S.C. § 802(11).[17]  The Act defines "deliver" as "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship."  Id. § 802(8).  Although the Act does not define the term "transfer," we may interpret this word by reference to its commonly accepted meaning.  See United States v. Collazo-Castro, 660 F.3d 516, 520 (1st Cir. 2011) ("[W]e begin with the ordinary meaning of the terms," which we may decipher by "consult[ing] dictionary definitions, interpretations given to the same terms by judicial construction, and the statutory context in which the words are used." (quoting Hernández-Miranda v. Empresas Díaz Massó, Inc., 651 F.3d 167, 171 (1st Cir. 2011) (internal quotation marks omitted)), cert. denied 132 S. Ct. 1593 (2012).  To transfer means "to carry or take from one person or place to another . . . ; to move or send to a different location . . . ; to cause to pass from

---

[17]   This statutory definition is consistent with the ordinary meaning of "distribution," which is defined as "[t]he act or process of apportioning or giving out."  Black's Law Dictionary 543 (9th ed. 2009).

one person or thing to another."  Webster's Third New International Dictionary 2426-27 (1993); see also Oxford English Dictionary (2d ed. 1989), available at http://www.oed.com (defining "transfer" as "[t]o convey or take from one place, person, etc. to another; to transmit, transport; to give or hand over from one to another); Black's Law Dictionary 1636 (9th ed. 2009) (defining "transfer" as "[a]ny mode of disposing of or parting with an asset").

Courts, including this one, have held that "distribute" is defined broadly under § 841(a)(1).  See United States v. Castro, 279 F.3d 30, 34 (1st Cir. 2002) ("Section 841(a)(1) contains a broad prohibition on distribution . . . ."); see also United States v. Birbragher, 603 F.3d 478, 485 (8th Cir. 2010) (describing § 841 as a "broad prohibition on the distribution of controlled substances"); United States v. Wallace, 532 F.3d 126, 129 (2d Cir. 2008) (explaining that use of the broad terms "distribute" and "deliver" bespeaks a congressional intent "to proscribe a range of conduct broader than the mere sale of narcotics" (quoting United States v. Washington, 41 F.3d 917, 919 (4th Cir. 1994) (internal quotation marks omitted))); United States v. Tingle, 183 F.3d 719, 727 n.3 (7th Cir. 1999) ("Courts usually interpret the term 'distribution' and related words quite broadly."); Washington, 41 F.3d at 919 ("[I]n enacting the 1970 Act, Congress intended to proscribe a range of conduct broader than the mere sale of narcotics."); United States v. Catchings, 922 F.2d 777, 779 (11th

Cir. 1991) (per curiam) (rejecting a "narrow construction of 'distribute'" and stating that the circuit "interpret[s] distribution broadly"); <u>United States</u> v. <u>Luster</u>, 896 F.2d 1122, 1127 (8th Cir. 1990) ("Courts have interpreted the term 'distribute' under subsection 841(a) quite broadly . . . ."); <u>United States</u> v. <u>Ahumada-Avalos</u>, 875 F.2d 681, 683 (9th Cir. 1989) (per curiam) ("The courts usually interpret the term 'distribution' quite broadly."); <u>United States</u> v. <u>Brunty</u>, 701 F.2d 1375, 1381 (11th Cir. 1983) ("Cases involving distribution under § 841(a) support a broad construction of the offense.").

Defendants' conduct here falls within the language of the statute. The jury found that the defendants agreed, voluntarily and knowingly, to take the drugs, either from the black box in Santiago's office or from one another, and to intentionally transfer, and so distribute, those drugs to the victims' persons or property in their proximity. They did this so that the drugs would be "discovered" by officers, giving cause for the victims' arrest. The defendants' acts of transferring the drugs amongst each other and to the victims constitutes an intent to distribute the drugs under § 841(a)(1), which results in a transfer of possession of a controlled substance, in other words, a "distribution." "[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" <u>United States</u> v. <u>Ron Pair Enters., Inc.</u>, 489 U.S. 235, 241 (1989) (quoting <u>Caminetti</u>

v. <u>United States</u>, 242 U.S. 470, 485 (1917)); <u>see also</u> <u>People To End</u> <u>Homelessness, Inc.</u> v. <u>Develco Singles Apartments Assocs.</u>, 339 F.3d 1, 6 (1st Cir. 2003).

"Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." <u>Albernaz</u> v. <u>United States</u>, 450 U.S. 333, 336 (1981) (quoting <u>Consumers Prod. Safety Comm'n</u> v. <u>GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980)) (internal quotation marks omitted). There is no clearly expressed legislative intention to the contrary here, so we regard the text as conclusive. There is no language anywhere in the statute which supports defendants argument of non-coverage. Rather, as explained later, there is other language which works to the contrary.

Application of § 841(a)(1) here is supported not only by the language but by the fact that this language reflects a deliberate choice by Congress to use broad language. "The Comprehensive Drug Abuse Prevention and Control Act of 1970 is extremely broad in scope, no longer restricted to the narrower concepts of buy and sell, but all inclusive in covering the entire field of narcotics and dangerous drugs in all phases of their manufacturing, processing, distribution and use." <u>United States</u> v. <u>Pruitt</u>, 487 F.2d 1241, 1245 (8th Cir. 1973). Before the enactment of the Act, a participant in an illegal drug transaction had to be

punished as either a seller or a buyer.  Id. (citing United States v. Moses, 220 F.2d 166, 168 (3d Cir. 1955)).

Congress, recognizing that narcotics typically pass through several hands before reaching the ultimate user, opted to view the transaction as a whole and intended to make illegal participation at any and all stages.  As a result, "[a]ny individual who participates in any manner in the unauthorized distribution of such 'controlled substances' is amenable to the Act and the sanctions provided therein."  Id. (emphasis added); Brunty, 701 F.2d at 1381; United States v. Wigley, 627 F.2d 224, 226 (10th Cir. 1980) (per curiam).

Based on this deliberate choice not to restrict § 841, including to buying or selling, courts have concluded that "Congress undoubtedly intended by this new Act to make an all-out attempt to combat illicit drugs" by targeting "any individual who knowingly participates in the distribution" in any way.  Pruitt, 487 F.2d at 1245.  "The distribution provision has been held to criminalize 'participation in the transaction viewed as a whole.'" Ahumada-Avalos, 875 F.2d at 683 (quoting Brunty, 701 F.2d at 1381); see also Pruitt, 487 F.2d at 1245; Wigley, 627 F.2d at 226. "Courts have interpreted the term 'distribute' under subsection 841(a) quite broadly to include not only the transfer of physical possession, but also other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or

-35-

negotiating for or receiving the purchase price." Luster, 896 F.2d at 1127 (quoting Brunty, 701 F.2d at 1381) (internal quotation marks omitted). The defendant need not even "actually touch[] or physically possess[] the drug" to be convicted under § 841. Catchings, 922 F.2d at 779-80 (citing United States v. Oquendo, 505 F.2d 1307, 1310 (5th Cir. 1975)); see also, e.g., United States v. Tejada, 886 F.2d 483, 490 (1st Cir. 1989) ("[P]roof of distribution does not necessarily include the element of possession."); United States v. Collins, 552 F.2d 243, 245-46 (8th Cir. 1977) (holding that defendant was properly convicted of distributing heroin under § 841(a) even though he did not physically transfer the heroin but was a conduit in the exchange of money).

In accord with this view of the term "distribute," we have recognized that distribution takes place in a wide variety of contexts and the relevant question is not the ultimate objective. For instance, we have stated that "[w]hether or not sharing [drugs] with a girlfriend is often so prosecuted, it is as much 'distribution' as selling on a street corner." United States v. Boidi, 568 F.3d 24, 29 (1st Cir. 2009). Likewise, we have noted that "[i]t is well accepted that drugs may be distributed by giving them away for free; 21 U.S.C. § 841(a)(1) imposes no requirement that a sale take place." United States v. Cormier, 468 F.3d 63, 70 n.3 (1st Cir. 2006). The underlying goal of the distribution is, under the plain language of the statute, irrelevant to the question

-36-

of whether there was a "distribution."  See United States v.
Santistevan, 39 F.3d 250, 255 n.7 (10th Cir. 1994) (stating that an
"improper motive" is not required under the statute).

Furthermore, the statute carves out specific exceptions
for legitimate activities which do not include the conduct here,
and which require the statute to be read against defendants'
arguments.  Congress was well aware of the question of legitimate
handling of drugs, for it carved out exceptions, but those
exceptions do not include the activities in which these defendants
engaged.

In one exception, Congress determined that distribution
of drugs by certain registered persons is lawful:

> Every person who . . . distributes any
> controlled substance or list I chemical, or
> who proposes to engage in the . . .
> distribution of any controlled substance or
> list I chemical, shall obtain annually a
> registration issued by the Attorney General in
> accordance with the rules and regulations
> promulgated by him.

21 U.S.C. § 822(a)(1).

Under 21 U.S.C. § 822(b), "[p]ersons registered . . .
[to] distribute . . . controlled substances or list I chemicals are
authorized to possess . . . [or] distribute . . . such substances
or chemicals . . . to the extent authorized by their registration
. . . ."  Id. § 822(b).  These defendants are not registered

persons authorized to distribute drugs, and so are not part of the legitimate distribution channels.[18]

Even more importantly, Congress carved out a specific exemption for distribution of controlled substances by law enforcement officers, but <u>only</u> to the extent that they are "lawfully engaged" in the enforcement of drug laws.  <u>See</u> <u>id.</u> § 885. Section 885 provides:

> (d)  <u>Immunity of Federal, State, local and other officials</u>
>
> Except as provided in sections 2234 and 2235 of title 18, no civil or criminal liability shall be imposed by virtue of this subchapter[19] upon any duly authorized Federal officer lawfully engaged in the enforcement of this subchapter, or upon any duly authorized officer of any State, territory, political subdivision thereof, the District of Columbia,

---

[18]  The legislative history states that the registration provisions were designed to "provid[e] for a 'closed' system of drug distribution for legitimate handlers of such drugs," H.R. Rep. No. 91-1444 (1970), <u>reprinted in</u> 1970 U.S.C.C.A.N. 4566, 4571-72, and to enable the Department of Justice "to keep track of all drugs subject to abuse manufactured or distributed in the United States in order to prevent diversion of these drugs from legitimate channels of commerce," <u>id.</u> at 4589.  <u>See also</u> <u>Gonzales</u> v. <u>Raich</u>, 545 U.S. 1, 13 (2005) ("Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.").  The legislative history states that "<u>all persons</u> engaged in the legitimate distribution chain involving drugs included in one of the schedules under the bill must be registered with the Attorney General." H.R. Rep. No. 91-1444 (1970), <u>reprinted in</u> 1970 U.S.C.C.A.N. 4566, 4589 (emphasis added); <u>see also</u> 21 U.S.C. § 822(a)(1) (requiring "<u>[e]very person</u>" who distributes controlled substances to register with the Attorney General (emphasis added)).

[19]  Subchapter I of Title 21, Chapter 13 of the United States Code extends from 21 U.S.C. § 801 to § 904.

-38-

> or any possession of the United States, who
> shall be _lawfully engaged_ in the enforcement
> of any law or municipal ordinance relating to
> controlled substances.

Id. § 885(d) (emphasis added); see also H.R. Rep. No. 91-1444 (1970), reprinted in 1970 U.S.C.C.A.N. 4566, 4625 (explaining that this provision "exempts federal officers from liability when lawfully engaged in enforcing Title II and further exempts state and local officers when lawfully engaged in enforcing any law relating to controlled substances").  There has never been any claim at trial or on appeal that these defendants are entitled to that immunity.

This provision protects accepted law enforcement tactics such as sting or reverse-sting operations in which officers handle and transfer drugs,[20] the transfer of suspected drugs to DEA laboratory agents for analysis,[21] or to a clerk of court in the

---

[20]  The Supreme Court has been clear, in the entrapment context, that law enforcement officers may engage in undercover sting or reverse-sting operations to ensnare drug dealers.  See United States v. Russell, 411 U.S. 423, 432 (1973); see also Hampton v. United States, 425 U.S. 484, 489-90 (1976) (plurality opinion).  We have likewise explained that "[i]t is incontrovertible that the government may supply drugs to a suspect in the course of a drug investigation."  United States v. Santana, 6 F.3d 1, 5 (1st Cir. 1993) (collecting cases).  These defendants do not fall within that category and do not argue that they do.

[21]  The Attorney General has promulgated regulations exempting certain officials from registration requirements.  See 21 C.F.R. § 1301.24 (entitled "Exemption of law enforcement officials"); see also id. § 1301.01 (explaining that this regulation applies to 21 U.S.C. §§ 821-824 and §§ 957-958).  These regulations extend the protections of § 885(d) and waive the requirement of registration as to registered laboratories and their personnel, "when acting in

course of presenting evidence at trial, none of which could give rise to prosecution under § 841.

Because only those officers "lawfully" enforcing the controlled substances laws are protected under § 885, the existence of § 885(d) evidences that law enforcement officials who do not fall within that immunity and who exceed lawful enforcement techniques may be prosecuted under the statute. Police officers who plant drugs on persons in order to create a false basis for arrest are not "lawfully engaged" in law enforcement activities, and thus under the plain language of the statute they may be prosecuted for distribution. Further, Congress contemplated that the provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970 would apply to the unlawful conduct of law enforcement officers, like the conduct at issue here, or there would be no reason to have enacted this provision.

Indeed, a plurality of the Supreme Court has explained that "[i]f the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." Hampton v. United States, 425 U.S. 484, 490 (1976) (plurality

_____

the scope of their official duties." Id. § 1301.24(c). These regulations also make clear that distribution of drugs between officials who are all "exempted by this section" and "acting in the course of [their] official duties" falls within the exemption. Id. § 1301.24(b).

-40-

opinion) (emphasis added).  This was said in the context of rejecting a defendant's argument that the conduct of law enforcement agents in a reverse-sting narcotics operation required vacating the defendant's conviction.  See id.

Moreover, the immunity in § 885 is itself subject to two limits, evidencing that officers who exceed their authority are not to be given immunity.  Officers whose conduct violates 18 U.S.C. § 2234 or § 2235 are not entitled to immunity.  See 21 U.S.C. § 885(d).  Section 2234 provides a criminal penalty for any person who "in executing a search warrant, willfully exceeds his authority or exercises it with unnecessary severity."  18 U.S.C. § 2234. Section 2235 provides a criminal penalty for "[w]hoever maliciously and without probable cause procures a search warrant to be issued and executed."  Id. § 2235.  These provisions evidence that Congress expressly intended that officers engaged in unlawful search and seizure techniques are not entitled to immunity under § 885 and may therefore be prosecuted under the Act.[22]

---

[22]  Congress has emphasized the harm that unlawful conduct of law enforcement officers engaged in undercover activities can cause. A 1982 Senate Report noted, in the course of proposing reforms in response to the Abscam sting operation, that

    [l]aw enforcement agents should not engage in serious and harmful criminal activity, or intentionally injure innocent third parties, in an attempt to deter crime. There is little doubt that the costs of such tactics -- both to the target and to society -- are likely to outweigh by a substantial amount the benefits gained through deterrence of crime.

Here, these defendants were not "lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances." The evidence was overwhelming that their actions were taken in violation of official duties. Indeed, defendants do not even argue that § 885 applies to their conduct. There is a good reason for that. The defense is unavailable. These actions were not authorized by the functions of their law enforcement positions.[23] To apply the statute to the conduct of these defendants is neither absurd nor does it threaten, in the least, accepted law enforcement techniques.[24] Moreover, the federal

_____

S. Rep. No. 97-672, at 11 (1982) (citation omitted).

[23] Cf. United States v. Mack, 164 F.3d 467, 473 (9th Cir. 1999) ("The special attributes of government agencies that justify their regulated possession of contraband are nowhere to be found in this set of disquieting facts . . . .").

[24] The Attorney General has promulgated a set of Guidelines governing the FBI's use of undercover operations that recognize that "use of undercover techniques . . . is essential to the detection, prevention, and prosecution of . . . offenses involving controlled substances," but that "these techniques . . . should be carefully considered and monitored." Attorney General's Guidelines on FBI Undercover Operations § I (May 30, 2002), available at http://www.justice.gov/oig/special/0509/appendices.pdf. These Guidelines provide that "[e]xcept when authorized pursuant to these Guidelines, no undercover employee shall engage in any activity that would constitute a violation of Federal, state, or local law if engaged in by a private person acting without authorization." Id. § IV.H. Illegal conduct may be engaged in "to obtain information or evidence necessary for the success of the investigation and not reasonably available without the participation in the otherwise illegal activity," to establish or maintain cover, or to prevent death or serious bodily injury. Id. § IV.H(1). Undercover operations, including contemplated illegal activities, must be approved by the FBI Special Agent in Charge, including in circumstances involving "the controlled delivery of

government, acting through the United States Attorney for Puerto Rico, has taken the position that such prosecution is permissible and appropriate under § 841.

The dissent argues that the statute must be interpreted to preclude these prosecutions because there have been no decisions on prosecutions under § 841 for the planting of drugs as here (albeit there have been reported decisions under § 841 for other illegal actions by police, such as distributing drugs for sale).[25] But whether prosecutors exercise their discretion to prosecute does not say anything about the scope of an enacted statute. Further, that there are no reported decisions on these precise facts says nothing about the incidence rate of similar misconduct (which one hopes is rare) and nothing about whether similar prosecutions were brought but did not result in reported decisions. Moreover,

---

drugs which will not enter commerce." Id. § IV.H(5)(a). The Guidelines require preparation for, as well as monitoring and periodic review of, all undercover operations, to guard against abuses. Id. § VI.

[25] See, e.g., United States v. Wright, 634 F.3d 770, 775-77 (5th Cir. 2011) (rejecting defense under § 885(d) as to deputy sheriff found guilty of attempting to possess with the intent to distribute cocaine), cert. denied, 132 S. Ct. 171 (2011); United States v. Sanchez-Berrios, 424 F.3d 65, 71-72 (1st Cir. 2005) (affirming the convictions of three officers for conspiring to distribute over five kilograms of cocaine); United States v. Serrano-Beauvaix, 400 F.3d 50, 52 (1st Cir. 2005) (affirming convictions of an officer and former officer for conspiracy to distribute over five kilograms of cocaine); United States v. Reeves, 730 F.2d 1189, 1195-96 (8th Cir. 1984) (rejecting defense under § 885(d) as to sheriff and his deputy found guilty of conspiracy to distribute and distribution of marijuana).

Congress and the Constitution have given the Executive Branch some prosecutorial discretion as to when to prosecute. No such discretion is given to the Judicial Branch to invalidate convictions on the basis of whether or not there have been few prosecutions on similar facts in the past. Here there have been widespread and well-documented abuses of local police power in this jurisdiction, particularly as to the massive criminal drug conspiracies which afflict Puerto Rico. See, e.g., United States v. Flecha-Maldonado, 373 F.3d 170, 172, 174 (1st Cir. 2004). Defendants do not claim there was some improper motive for the prosecution, nor could there have been. Indeed, bringing prosecutions to deter such conduct is entirely appropriate.

In short, both the language and the intent of § 841(a) is such that it applies to the conduct at issue in this case.

## 2. Specific Intent to Distribute

We turn to the defendants' argument that the evidentiary record does not support a conspiracy with the object of possessing controlled substances with an intent to distribute under 21 U.S.C. §§ 841(a)(1) & 846.

As said, specific intent requires a showing that the defendant intended the proscribed outcome as his purpose. Dyer, 589 F.3d at 528. In the context of a charge of conspiracy to "possess with intent to . . . distribute" controlled substances, 21 U.S.C. § 841(a)(1), the relevant specific intent the defendants

-44-

must have is a specific intent "to distribute" the controlled substances, see, e.g., United States v. Rivera-Donate, 682 F.3d 120, 133 (1st Cir. 2012) ("To prove the underlying offense of 'possession with intent to distribute, the government must show that the defendants knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute.'" (quoting García-Carrasquillo, 483 F.3d at 130) (emphasis added)). The evidence is that there was a transfer of drugs between the officers followed by the planting of drugs to facilitate arrests, which amounts to distribution; it follows that the intent to take those actions satisfies the specific intent requirement of the statute.

The relevant intent here is the "intent to distribute." The dissent argues that because the officers' intent was to fabricate cases by planting evidence, the officers cannot have had the specific intent to distribute the drugs. This argument conflates the specific intent to distribute required by the statute with the very different question of the ultimate objective. Only the former is an element of the statute; the ultimate objective is not a part of the statutory test. That this was Congress's intent is shown not only because there is no reference to the ultimate objective as a matter of statutory language, but also because Congress decided not to make buying or selling elements of the offense. What matters as to specific intent is that the defendant

-45-

intended to transfer the drugs to someone else.[26]  See Boidi, 568 F.3d at 29; Cormier, 468 F.3d at 70 n.3; Santistevan, 39 F.3d at 255 n.7.

The dissent also suggests that specific intent to distribute the drugs requires that the defendant intend to either further the incidence of drug abuse or intend to introduce or circulate the drugs into society's illicit drug market channels. This is not the test for specific intent under § 841, and no court has so held.

---

[26]  Even so, the evidence is that the officers did intend to introduce the drugs into society's illicit channels -- the victims had to be in unlawful possession of the drugs in order for the officers to achieve a "positive" result.  Indeed, the evidence shows that the officers repeatedly transferred the drugs to known drug leaders and dealers, often leaving drugs somewhere on the drug dealer's property so that the drugs would be "discovered" by other officers.

Further, the record would permit a jury to find that the drugs did not always or necessarily remain under the control of the planting officers.  For example, at the home of Omayra Segarra, a/k/a "Puchi," a known drug leader, Officer Vélez left cocaine on a shelf in a closet.  Vélez testified that he thereafter left the closet, and that he did not know whether anyone found the cocaine planted in the closet.

The record also permits a finding that planted drugs were not always returned to the black box.  Bosques testified that generally when he seized drugs, the drugs were placed in evidence envelopes and stored in his locker "for a few days" before he handed them in for processing.

Muñiz likewise testified that recovered drugs "must be deposited inside an envelope, an evidence envelope, and be stored in a locker we have for those purposes."  In order to successfully prosecute, the drugs would be used as evidence.

The dissent further argues that the specific intent to commit this particular offense cannot be inferred from the actions undertaken by defendants to distribute the drugs. We disagree. The defendants were not charged with distribution; they were charged with conspiracy to possess with intent to distribute controlled substances. The fact that the defendants did in fact distribute the drugs is quite properly considered in determining whether the defendants had earlier entered into a conspiracy to possess with intent to distribute such drugs. See United States v. Coleman, 584 F.3d 1121, 1125 (8th Cir. 2009) (evidence that the defendant "repeatedly provided crack" to individuals for resale "alone provided a sufficient basis to infer that [the defendant] knowingly and intentionally joined an agreement to distribute crack"); United States v. Smith, 233 F. App'x 297, 300 (4th Cir. 2007) ("By assisting Smith in the actual distribution of crack . . . , it was reasonable for the jury to infer that Carr knew Smith was involved in the illegal distribution of a controlled substance and knowingly participated in Smith's possession of crack cocaine with the intent to distribute."); United States v. Childress, 58 F.3d 693, 728-29 (D.C. Cir. 1995) (defendant's acts of delivering bags containing drugs "would normally support an inference that he had the specific intent to further the object of the conspiracy" to distribute and to possess with intent to distribute); United States v. Douglas, 874 F.2d 1145, 1159 n.24

(7th Cir. 1989) (where defendant "was charged with conspiracy to possess with intent to distribute," the "[e]vidence of [the defendant's] drug distribution before and after the purchases from [another individual] is probative of [the defendant's] <u>intent</u> with regards to the drugs he bought . . . did he possess the drugs with intent to distribute them?"); <u>United States</u> v. <u>Thomas</u>, 551 F.2d 347, 348 (D.C. Cir. 1976) (per curiam) (where defendant is charged with possession with intent to distribute, testimony that an "actual drug sale" took place is "directly probative" of the defendant's intent to distribute the drug).

Further, the evidence, "taken as a whole and in the light most favorable to the prosecution," <u>United States</u> v. <u>Lopez-Lopez</u>, 282 F.3d 1, 19-20 (1st Cir. 2002), would permit a rational jury to determine beyond a reasonable doubt that the defendants were guilty of conspiring to possess with intent to distribute a controlled substance in violation of § 841(a)(1) and § 846.

The evidence at trial included the testimony of three co-conspirators: Lieutenant Dennis Muñiz, the director of the Division from 2005 to 2007, as well as Luis Vélez and José Bosques, two officers in the Division. All three witnesses described the distribution chain, namely the pattern by which Santiago and Muñiz would distribute illegal drugs to officers with instructions to transfer the evidence to the victim's person, property, or presence in order to yield a "positive" search. The testimony identified

the active participants in the scheme, which included all three of the defendants here. This testimony was corroborated by a series of audio and video recordings showing that the defendants transferred the drugs both amongst one another and to the victims.

The witnesses described particular instances in which at least one of the defendants transferred drugs to the victims, many of whom were known drug leaders and dealers. All three defendants were identified as having participated in at least one such planting. The drugs were generally transferred to the drug leaders' property or presence in the hope that other officers would subsequently discover them and arrest the victim before the drugs could be transferred again. For example, at the home of Omayra Segarra, a/k/a "Puchi," a known drug leader, the drugs were left both on a shelf in the closet and in Puchi's vehicle. Other officers eventually came upon the planted evidence and used it to make an arrest. Similarly, at José "El Monstruo's" home, the drugs were left in a closet next to the bathroom before any officers initiated a search. Other officers later came upon the evidence when searching and, again, used it to make an arrest. At two housing projects, Monte Isleño and the Columbus Landing project, both of which were known sites of drug activity, the drugs were placed in a bureau drawer and a pile of men's shoes, respectively, and left there to be later discovered by other searching officers.

To the extent the defendants challenge the credibility of the government's witnesses, our sufficiency analysis does not permit us to "'assess the credibility of a witness, as that is a role reserved for the jury.'" United States v. Rivera-Rodríguez, 617 F.3d at 595 n.6 (quoting United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009)); see also United States v. Calderon, 77 F.3d 6, 10 (1st Cir. 1996) ("It [is] well within the jury's province for it to choose to believe the testimony of [the defendant's] accomplices -- in the face of . . . cross-examination of their characters and motives -- and to disbelieve [the defendant's] version of the story."). In any event, the testimony of each witness was corroborated, not only by the testimony of the other witnesses, but also by the audio and video recordings.

The evidence of a conspiracy to possess with intent to distribute goes beyond the officers' actual physical acts of transferring and planting of drugs, and includes numerous instances of discussion as to distribution and planting of drugs among the officers before, during, and after the arrests. The witnesses testified that the defendants regularly met at the Division before executing a search warrant, at which point Santiago would hand out drugs to agents with instructions to transfer the drugs to the

victims' persons, property, or presence in order to fabricate a "positive" search.[27]

The testimony also identified several instances in which the co-conspirators did the planting in teams and/or discussed with one another the incidents of evidence planting. The witnesses also testified that, when the FBI executed a search warrant to locate and seize the black box, several of the co-conspirators met to try to concoct an alibi for their possession of the box and the drugs it contained.

We conclude that the verdict here was "supported by a plausible rendition of the evidence," taken as a whole and in the light most favorable to the prosecution, and so we do not disturb the jury's verdict. Lopez-Lopez, 282 F.3d at 19-20. We acknowledge that our result is driven by the plain language of the statute and its history, and that Congress may not have anticipated

---

[27] Muñiz testified that he and Santiago discussed to which officers Santiago had distributed drugs for the purpose of fabricating arrests, and that the drugs were "distributed" during meetings at the office, while they were preparing documents before going out to make arrests. Vélez testified that before going out on arrest operations, they met in either Santiago's or Muñiz's office to discuss "the work that was going to be done, the plan" as to the arrests. There were planning meetings before operations, where the planting of drugs was planned. Santiago and Muñiz would often, during the search operations, give instructions over the phone that the search had to result in an arrest.

Bosques testified about asking Cortés for heroin, to justify an arrest that he had made, and that Cortés provided him with the drugs. Vélez testified that Domínguez requested that Vélez provide him with drugs from the black box, for the purpose of substantiating an arrest already made.

this precise scenario in writing the statute.  If Congress disagrees with this outcome, it is free to amend the statute.  The defendants' convictions under count two are affirmed.

## C.  Sentencing Challenges

Appellants Domínguez, Santiago, and Ruperto raise individual challenges to their respective sentences.  We address each challenge in turn.  We review the district court's interpretation and application of the sentencing guidelines <u>de novo</u> and factual findings for clear error.  <u>United States</u> v. <u>Aquasvivas-Castillo</u>, 668 F.3d 7, 13 (1st Cir. 2012).

### 1.    Domínguez's Challenge

Domínguez argues that the district court erred in its determination of the drug quantity to use in sentencing Domínguez for his role in the conspiracy as to count two.  This challenge fails.

The district court sentenced Domínguez to 40 months' imprisonment as to count one and 78 months' imprisonment as to count two, to be served concurrently, based on a guidelines range of 78 to 91 months.[28]  The district court found that counts one and two resulted in a combined base offense level of 28, and that no

_____

[28]  On January 12, 2012, the district court reduced the sentence as to count two to 60 months' imprisonment, as was stipulated by the parties, in light of the retroactive changes to the sentencing guidelines promulgated in response to the Fair Sentencing Act of 2010.  <u>See</u> <u>United States</u> v. <u>Curet</u>, 670 F.3d 296, 308-10 (1st Cir. 2012) (discussing the Act and the retroactive changes to the guidelines), <u>cert. denied</u>, 132 S. Ct. 2728 (2012).

adjustments applied.  The base offense level for count two was calculated based on the quantity of drugs involved in the offense. See U.S.S.G. § 2D1.1(a)(3) (2008).

The quantity of drugs the district court used for guidelines calculations purposes was the quantity of drugs seized when the FBI searched the defendants' offices on July 17, 2007, which amounted to 6.8 grams of crack cocaine, 3.91 grams of heroin, and 86.4 grams of marijuana.  These drugs were found in three locations: the black box, an area of Santiago's office, and a hiding spot in the ceiling.  This translated to a drug quantity value of between 100 and 400 kilograms of marijuana.  See id. § 2D1.1 cmt. n.10(B) (2008) (stating that the drug equivalency tables in the guidelines "provide a means for combining differing controlled substances to obtain a single offense level").

Under the guidelines, although advisory, the quantity of drugs attributable to a defendant for sentencing purposes is based on both the charged conduct and the relevant uncharged conduct. United States v. González-Vélez, 587 F.3d 494, 508 (1st Cir. 2009); see also U.S.S.G. § 1B1.1 cmt. n.1(H) (2008) (defining the term "[o]ffense" as including "the offense of conviction and all relevant conduct under § 1B1.3").  Relevant conduct includes, "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G.

§ 1B1.3(a)(1)(B) (2008).  Accordingly, in the drug conspiracy context, "each coconspirator is responsible not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy."  United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004).

We review drug quantity determinations in two steps. First, we review de novo "whether the district court's drug quantity determination was based on an individualized determination" of the "quantity of drugs attributable to, or reasonably foreseeable by, the offender."  United States v. Cintrón-Echautequi, 604 F.3d 1, 5 (1st Cir. 2010).  If the district court made such an "individualized determination, our review is for clear error."  Id.

Domínguez contends that the district court erred in determining that he was sufficiently close to the conspiracy such that the quantity of drugs seized was reasonably foreseeable to him.  We reject this challenge.

The district court made an individualized determination. The district court recognized that the amount of drugs seized could not be attributed to Domínguez unless the drugs were reasonably foreseeable to Domínguez.  The district court found that this was a closely knit conspiracy to plant drugs to obtain arrests, that Domínguez knew about the black box being one of the sources of

drugs, and had been seen with the black box.  The district court also found that Domínguez was close to the leaders of the conspiracy and had participated in two acts of planting drugs, at least one of which was with drugs from the black box.[29]  The district court concluded, based on this evidence, that the quantity of drugs seized was reasonably foreseeable to Domínguez.

Because an individualized determination was made, clear error review applies.  We will only reverse for clear error if "upon whole-record review, an inquiring court 'form[s] a strong, unyielding belief that a mistake has been made.'"  Id. at 6 (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

There was no clear error.  Domínguez does not dispute the quantity of drugs seized, but rather only argues that the quantity was not reasonably foreseeable to him.  It was not clear error for the district court to find the quantity reasonably foreseeable to him, given the evidence outlined above.  We affirm Domínguez's sentence.

---

[29]  One of these events involved Domínguez requesting two bags of crack cocaine from the black box, which Vélez provided to him, for use in substantiating an arrest.  The second was an instance where an individual was arrested by Domínguez for possession of cocaine even though no cocaine was found.

In a separate event, in early July 2007, Domínguez provided Bosques with several bags of cocaine and marijuana.

## 2.    Santiago's Challenge

Santiago challenges the district court's imposition of a three-level enhancement for his role in the offense under U.S.S.G. § 3B1.1(b).[30]  Santiago also asserts, but does not develop an argument, that his sentence as a whole is unreasonable.  Both challenges fail.

Section 3B1.1(b) provides that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels."  Id.  Santiago concedes that "the criminal activity involved five or more participants or was otherwise extensive," but argues that he was not a "manager or supervisor" within the meaning of the provision, and so the enhancement was unwarranted.  This argument fails.

While the guidelines do not define the term "supervisor" or "manager," we have held that "[e]vidence of the defendant's role in the conspiracy 'may be wholly circumstantial,' and need only show that he 'exercised authority or control over another participant on one occasion.'"  United States v. Flores-de-Jesús, 569 F.3d 8, 34 (1st Cir. 2009) (quoting United States v. García-Morales, 382 F.3d 12, 19-20 (1st Cir. 2004)); see also United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997) (en banc) (stating

_____

[30]    Neither party states to which count this enhancement was applied.  Since we affirm the enhancement, we need not address the matter.

-56-

that the analogous enhancement based on "organizer, leader, manager, or supervisor" status in U.S.S.G. § 3B1.1(c) applies if "the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of, at least one of those other persons"). For the enhancement to apply, it is not enough to show that "the defendant merely controlled, organized, or managed criminal activities; rather, he must instead control, organize, or manage criminal actors." Flores-de-Jesús, 569 F.3d at 34 (quoting United States v. Ofray-Campos, 534 F.3d 1, 40 (1st Cir. 2008)) (internal quotation marks omitted).

In this case, there was extensive testimony as to Santiago's role in supervising or managing the conspiracy. Santiago's official position was as a supervisor in the division. The witnesses testified that Santiago was in charge of maintaining the black box and distributing the drugs to the other officers before search operations. When Santiago was out of town in July 2007, he transferred the box to Vélez, so that Vélez could provide the officers drugs in his absence. During a variety of searches, Santiago issued instructions as to the planting of drugs. For instance, before the search of José "El Monstruo's" home, Santiago provided bags of cocaine and marijuana to Vélez, with instructions to wait for a call from Santiago and Muñiz; Santiago and Muñiz called Vélez during the search with instructions to plant the

drugs.  Similarly, before the search of "Puchi's" residence, Santiago provided Vélez with cocaine and marijuana along with instructions that the search had to result in an arrest.  Santiago later arrived at the scene, after discussing the situation with Vélez over the phone.  When Vélez protested that he did not want to plant the drugs, Santiago told him to do so, and Vélez complied; Santiago later instructed Vélez to retrieve the drugs, and Vélez again complied.  Bosques testified that "Santiago was the one who ordered me to do whatever work."

In light of this evidence, the district court did not err in finding that Santiago "exercised authority or control over another participant on [at least] one occasion."  Id. (quoting García-Morales, 382 F.3d at 19-20 (internal quotation marks omitted).

Santiago also asserts without analysis that the overall sentence was unreasonable, and so has waived this challenge.  Even bypassing waiver, the argument fails on its own terms.  The district court properly calculated the guidelines range, so we review the reasonableness of the sentence for an abuse of discretion.  Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Ozuna-Cabrera, 663 F.3d 496, 503 (1st Cir. 2011), cert. denied, 132 S. Ct. 1936 (2012).  The district court considered the sentencing factors outlined in 18 U.S.C. § 3553(a), including Santiago's years of service, and concluded that it was appropriate

to sentence Santiago "to the lower end of the applicable guidelines." The applicable guidelines range was 108 to 135 months, and the district court sentenced Santiago to 108 months' imprisonment for count one as well as count two, to be served concurrently.[31] Santiago bears a "heavy burden" of showing that this sentence within the guidelines range was unreasonable, which he has not met. Ozuna-Cabrera, 663 F.3d at 504. Further, "a sentence will withstand a substantive reasonableness challenge so long as there is 'a plausible sentencing rationale and a defensible result,'" as was the case here. Id. (quoting United States v. Martin, 520 F.3d 87, 96 (2008)). Santiago's challenge fails and we affirm his sentence.

### 3. Ruperto's Challenge

Ruperto asserts that the district court erred in applying the sentencing guidelines when determining his sentence. We review the district court's interpretation of the sentencing guidelines de novo. United States v. Sicher, 576 F.3d 64, 70 (1st Cir. 2009).

Ruperto argues that the district court erred when it computed his advisory guideline range because it applied U.S.S.G.

---

[31] On March 21, 2012, the district court reduced the sentence as to both counts to 78 months' imprisonment, as was stipulated by the parties, in light of the retroactive changes to the sentencing guidelines promulgated in response to the Fair Sentencing Act of 2010.

§ 2J1.2,[32] which he asserts is not applicable to his underlying offense, instead of U.S.S.G. § 2H1.1.[33]  A review of the record establishes that the district court did as appellant zealously advocates it should have done and applied § 2H1.1.

The record shows that the district court held two hearings concerning Ruperto's sentencing.  During the second hearing, held on July 31, 2009, the district court decided to apply guideline 2H1.1.  The transcript from that hearing reveals the following exchanges:

> [Appellant's Counsel]:  As we addressed in our opposition to the Government's informative motion, <u>we represent no opposition to guideline 2H1.1</u> and the 12 level base offense level that is contained there.
>
> The Court:  <u>That[, guideline 2H1.1,] is the one I am going to use.</u>
>
> * * * *
>
> [Appellant's Counsel]:  . . . And <u>we are basically in agreement with the Court that 2H1.1 is the guideline to apply in this case.</u>
>
> The Court:  <u>2H1.1 is the one I'm going to apply.</u>
>
> * * * *

---

[32]  The term "U.S.S.G." refers to the United States Sentencing Guidelines.

[33]  Section 2J1.2 of the sentencing guidelines specifically applies to convictions for obstruction of justice, which are not at issue in this case.  U.S.S.G. § 2J1.2.  Section 2H1.1 applies to convictions for offenses involving individual rights.  U.S.S.G. § 2H1.1.

> The Court: . . . Since the Defendant was a public official at the time of the offense and the offense was committed under color of law, a six level increase is <u>applied pursuant to United States Guidelines 2H1.1(b)1</u>.
>
> * * * *
>
> The Court: Yes, this Defendant's report should also be amended to include the following, <u>the 2H1.1</u>, the six-level increase and the four levels of supervisory conduct.

(Emphasis added).

Ruperto, in essence, is stepping up to the plate when the players have already cleared the field. We find no error in the district court's interpretation or application of the sentencing guidelines to Ruperto, and we therefore affirm.

### III. <u>Conclusion</u>

We are both disturbed and disheartened by the incidents underlying this appeal. Appellants, as police officers, held positions of authority that society regards with admiration and respect, and which it trusts to safeguard our freedoms, not infringe upon them; to protect us from harm, not be the instigator thereof; and to stand the post, not be the cause for the watch. As often echoed, with great power comes great responsibility,[34] and appellants showed themselves susceptible to corruption's tarnishing

---

[34] Perhaps one of the best known original sources of this phrase is from the comic book, Spider-Man. <u>See</u> <u>Amazing Fantasy #15</u> (Marvel Comics, August 1962). It is also believed to have possibly originated with Voltaire. <u>See</u> Voltaire, et al., 48 <u>Oeuvres de Voltaire</u> (Lefèvre, 1840).

influence often found lapping at the shores of such power.  Simply put, appellants disregarded the honorable integrity of their guardian role, and civil liberties were dealt the tragic blow.  We can express no greater disapproval or remorse than this: we are saddened and indignant that today, it falls to us to assume the role of guarding the guardians.

**<u>Affirmed</u>.**

**"Dissenting Opinion as to Part II.B, Part II.C.1.,**

**and Part II.C.2 follows"**

**TORRUELLA, Circuit Judge, dissenting as to Part II.B, Part II.C.1, and Part II.C.2.** As stated in Part II.A of my opinion for the court, my colleagues and I agree that the record supports the government's allegations as to count one, i.e., that appellants' actions in planting drugs for the purpose of fabricating criminal cases constitutes a violation of 18 U.S.C. § 241. The government's case charged in count two, however, conspiring to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) & 846, is a horse of another color.

## I.

On carefully considering the distribution statute's mental state requirement, legislative history, and the historical background surrounding its enactment, I believe that my colleagues' conclusion in Part II.B of the court's opinion -- that the officers' scheme of possessing and illegally planting controlled substances with the sole intent to fabricate grounds for a target's unlawful arrest is tantamount to possession of controlled substances with an intent to distribute -- asks far too much of both Congress's purpose in creating such legislation and the statute's expressly-stated specific intent requirement.

Firstly, I believe my colleagues' analysis incorrectly centers on whether the officers' actions could properly constitute "distribution," an issue that is not before us and on which I offer

-63-

no comment. Nor do I believe it appropriate for my colleagues to go as far as they have and conclusively hold that the officers' actions here constitute distribution, see Maj. Op. at 45, 47 -- that charge has not been presented to this court, and I believe it is a question best left unaddressed.

Specifically, the majority on this issue consistently analyzes appellants' arguments on count two by focusing solely on their physical acts. See Maj. Op. at 28-29 ("Because the express language of the statute encompasses defendants' conduct . . . we affirm their conviction under count two."); (emphasis added); see also id. at 40 ("Congress contemplated that the provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970 would apply to the unlawful conduct of law enforcement officers, like the conduct at issue here . . . .") (emphasis added). My colleagues troublingly continue down this path of blurring the distinction between the actus reus of one crime and the mens rea of another (distribution versus possession with intent to distribute) throughout their opinion. See Maj. Op. at 32-33 (citing case law describing courts' broad construction of distribution); id. at 33 ("Defendants' conduct here falls within the language of the statute.") (emphasis added); id. at 35-36 (noting case law in which courts have taken a broad approach to what conduct or level of participation will satisfy the statute's intent-to-distribute requirement; citing case law concerning whether defendants' acts

-64-

constituted distribution); id. at 42 ("To apply the statute to the conduct of these defendants is neither absurd nor does it threaten. . . accepted law enforcement techniques.") (emphasis added); id. at 44 ("[B]oth the language and the intent of § 841(a) is such that it applies to the conduct at issue in this case.").

Our concern on this appeal, however, is not the appellants' conduct, but rather, the question of whether they held the requisite statutory mental state at the time they planted the drugs. Indeed, the officers here were not charged with the physical act of distribution; rather, they were charged with possession of controlled substances with the particular mental intent to distribute, a crime requiring a higher mental showing than the act of distribution. To conclude otherwise, as my colleagues now do, waters down the law's specific intent element to nothing more than a general intent requirement.

Furthermore, I harbor serious misgivings as to my colleagues' analytical approach because I believe it has the unwanted effect of removing the statute from its firmly planted and long-acknowledged legislative moorings. As discussed infra, Congress's purpose in enacting the statute at issue (as confirmed by its historical background and legislative history) was to target the twin evils of drug abuse (in the form of personal consumption) and drug trafficking (in the sense of injection of drugs into

society's illicit channels).  Significantly, neither of these elements is at play here.

Finally, I believe my reading of the statute's prohibition against possession of controlled substances with an intent to distribute as requiring a higher mental showing than simply an intent to physically move a controlled substance is supported by the fact that no other judgment ever has been issued sustaining the government's novel interpretation, namely, that an intent to falsify cases through planting evidence is commensurate with an intent to commit drug distribution.  In fact, the entire sweep of federal criminal jurisprudence up to the present case lacks any precedent in which the planting of controlled substances with the purpose of fabricating criminal charges has been held to constitute an intent to violate our nation's drug laws.  This dearth of prosecutions and convictions on the books supporting such a statutory interpretation is not, in my view, coincidental.  Nor, as my colleagues claim, do I believe that it may be explained away as a simple exercise of prosecutorial discretion; rather, I believe it is more likely the proper exercise of prosecutorial prudence, i.e., refraining from overreach.

The judiciary's deafening silence in this respect naturally follows, however, when one considers the history, purpose, and administration of Congress's controlled substances laws, all of which target drug abuse and/or drug trafficking, not

the charges listed in count two.  For these reasons, I respectfully dissent from the majority's conclusion that the officers here held the requisite specific intent under 21 U.S.C. §§ 841(a)(1) & 846.

**II.**

To prove the substantive offense at issue, possession with intent to distribute, the government must establish that appellants "knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute."  United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007) (emphasis added).[35]  The task at hand boils down to this: to determine whether appellants' intent to fabricate cases via planting controlled substances constitutes an intent to distribute within the meaning of what Congress has proscribed through the legislation in question.

**A.  Express Itself: Statute's Plain Language**

I begin with the statute's language.  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976) (stating the "starting point in every case involving construction of a statute is the language itself" (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975) (Powell, J., concurring)) (internal quotation mark omitted)); see also Recovery Grp., Inc. v. Comm'r,

---

[35]  The government's evidence in support of its count one and count two convictions is the same.  That is, the government points to no distinguishing evidence from that presented in its count one case in support of the count two convictions, nor does the record reveal any such additional evidence.

652 F.3d 122, 125 (1st Cir. 2011).  Section 841(a)(1) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the "Act" or "Controlled Substances Act") provides that: "[I]t shall be unlawful for any person knowingly or intentionally" to "possess with intent to . . . distribute . . . a controlled substance."  21 U.S.C. § 841(a)(1).  The Act defines "distribute" as "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical."  Id. § 802(11).  It defines "deliver" as "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship."  Id. § 802(8).

The majority accepts the government's request that the court's analysis end here and adopt a literal, mechanical reading of the statute.  And at first blush, "distribute," defined under the broadly-worded language of the statute to include delivery or transfer of a controlled substance, seems, potentially, to encapsulate the officers' actions under count two: the officers took and received controlled substances from one individual and/or location, brought the drugs to the homes of their targets, and temporarily placed them in a location cognizant that another officer would soon thereafter seize the drugs.

But such a literal viewing of the underlying acts -- focusing solely on the objective physical movement of the drugs -- overlooks an important aspect of the plain language of the statute.

To establish a violation of 21 U.S.C. § 841(a)(1)'s proscription against possession with intent to distribute, the government must show that the defendant knowingly and intentionally possessed a controlled substance with a very particular subjective purpose: to distribute. See 21 U.S.C. § 841(a)(1) (stating "it shall be unlawful for any person knowingly or intentionally" to "possess with intent to . . . distribute . . . a controlled substance") (emphasis added); United States v. Pomales-Lebrón, 513 F.3d 262, 267 (1st Cir. 2008) ("To establish a violation of 21 U.S.C. § 841, the government must prove that defendant: (1) possessed [controlled substances], 'either actually or constructively,' (2) 'did so with a specific intent to distribute the [controlled substances] over which [he] had actual or constructive possession,' and (3) 'did so knowingly and intentionally.'" (quoting United States v. López-López, 282 F.3d 1, 19 (1st Cir. 2002) (third alteration in original)). Thus, if the government cannot show that a defendant had the requisite statutory intent to distribute controlled substances at the time he possessed them, a conviction pursuant to 21 U.S.C. § 841(a)(1)'s proscriptions simply cannot stand. See United States v. Pope, 561 F.2d 663, 671 (6th Cir. 1977) ("'[I]ntent to distribute' is an essential element of § 841(a)(1), [and] the Government retains the burden of proving that element beyond a reasonable doubt.").

The majority claims that I confuse the question of specific intent with overall objective. See Maj. Op. at 36-37, 45-46. I do no such thing. Specific intent, as discussed infra, "requires more than a knowing violation of the law," namely, that "[t]he defendant [] act with a bad purpose or with the objective of committing the act prohibited by the law." United States v. Dyer, 589 F.3d 520, 533 (1st Cir. 2009) (Torruella, J., concurring in part and dissenting in part) (citing cases). In contrast, motive or "ulterior intent" has been defined as "[t]he intent that passes beyond a wrongful act and relates to the objective for the sake of which the act is done." Black's Law Dictionary 882 (9th ed. 2009); see also United States v. Boardman, 419 F.2d 110, 113-14 (1st Cir. 1969) (accepting trial court's jury instruction (for a different crime) generally distinguishing between motive and intent; noting trial court's definition of motive as "that which tempts, induces or moves a person to commit a crime," and intent as "the purpose or mental state with which the person does the act").

When the officers here performed the disputed acts, they did not hold the requisite intent to engage in drug distribution; instead, their intent while planting the drugs was always to fabricate a case against a particular target in order to effectuate a seemingly lawful arrest of that mark. The officers' motive, to the extent relevant, was provided to us in their briefs (the merits of which we need not and do not consider or address here, see

<u>United States</u> v. <u>Santistevan</u>, 39 F.3d 250, 255 n.7 (10th Cir. 1994)):[36] to satisfy an alleged Department-mandated arrest quota. Thus, the majority's contention that my analysis of the officers' specific intent (<u>i.e.</u>, their particular mental state at the time they planted the controlled substances) is nothing more than an analysis of the officers' overall objective for performing such acts (<u>i.e.</u>, performing seemingly lawful arrests to satisfy an alleged arrest quota) incorrectly frames my position.

To my reading, the majority does not adequately explain how a specific intent crime (possession <u>with intent to distribute</u>) may require the exact same intent showing as a general intent crime (distribution). <u>See</u> <u>McKenzie</u> v. <u>Risley</u>, 842 F.2d 1525, 1545 (9th Cir. 1988) (noting "general and specific intent are distinct and different"). Nor do I find the majority's conclusion that the officers' underlying physical acts, if accepted to constitute drug distribution (which the majority does), are sufficient, in and of themselves, to prove a specific intent to distribute. <u>Cf.</u>

---

[36] The majority also cites to <u>Santistevan</u> to support its contention that I confuse the officers' specific intent with their overall motive in performing the contested acts of planting. <u>See</u> Maj. Op. at 36-37, 45-46 (citing <u>Santistevan</u>, 39 F.3d at 255 n.7). Notably, <u>Santistevan</u> only concerns the general intent crime of distribution, not the specific intent crime at issue here. Moreover, the cited footnote's discussion addresses the relevance of a defendant's motive when assessing whether a defendant engaged in the act of <u>distribution</u>. As I repeatedly emphasize, our focus in this case should be on the specific intent required for the crime of possession with intent to distribute, not on the general intent requisites of the crime of drug distribution.

Morissette v. United States, 342 U.S. 246, 276 (1952) (fact that defendant performed actus reus of crime was relevant to whether defendant had intent to commit actual act of stealing, but was insufficient for purposes of showing the requisite mens rea of a specific intent to steal or convert property from another); Koehler v. United States, 189 F.2d 711, 715 (5th Cir. 1951) (Russell, J., dissenting) (citing cases and noting "the fatal taint inflicted by the language of the judge with reference to the intent legally presumed to follow from the commission of acts," which had the effect of negating the "well established rule of law that where wilfulness is an essential ingredient of an offense the specific intent must be proved as an independent fact and cannot be presumed as a matter of law from the commission of an unlawful act"); Hubbard v. United States, 79 F.2d 850, 853 (9th Cir. 1935) (similar). While the act of distribution would undoubtedly be a relevant factor to consider when assessing the officers' mental state, I do not believe (presuming distribution occurred) it should be the only one given the surrounding factual circumstances of this case, a point I address further infra. See United States v. Berrios, 676 F.3d 118, 137 (3d Cir. 2012) ("[A] defendant's specific intent is to be judged '[b]ased upon the totality of all the surrounding facts and circumstances.' (quoting United States v. Anderson, 108 F.3d 478, 485 (3d Cir. 1997)) (emphasis added)).

-72-

I thus proceed to address the higher evidentiary intent bar that the government had to (and in my mind, failed to) clear in this case.

## 1. General Intent versus Specific Intent

It is a fundamental principle that the trier of fact generally must assess both a defendant's actions and mind-set, splitting a crime into two parts: the actus reus of the crime (a physical act or omission, the performance (or lack thereof) of which the legislature has deemed unlawful), and the mens rea of the person committing the crime (the defendant's intent or mental state at the time of the crime). When assessing mental intent, courts generally distinguish between two kinds: general and specific.

The former (general intent) requires a showing that a defendant intended to perform a certain act. His mental intent, however, need only be to perform the physical act itself, that is, the actus reus of a crime; he need not possess any intent to violate the law. See United States v. Veach, 455 F.3d 628, 631 (6th Cir. 2006) (noting that a general intent crime "requires only that a defendant intend to do the act that the law proscribes" (quoting United States v. Gonyea, 140 F.3d 649, 653 (6th Cir. 1998))); United States v. Kleinbart, 27 F.3d 586, 592 n.4 (D.C. Cir. 1994) ("A general intent crime requires the knowing commission of an act that the law makes a crime."); United States v. Phillips, 19 F.3d 1565, 1576-77 (11th Cir. 1994) ("[A] defendant need not

intend to violate the law to commit a general intent crime, but he must actually intend to do the act that the law proscribes.").

In contrast, where specific intent is required, a heightened mental state is a sine qua non. The government must show not only that a defendant had a general intent to perform a particular act, but also, that he possessed a corresponding mental state when executing such acts. That is, that the defendant performed the offending acts with the specific purpose of producing the law's legally forbidden result, or the desired outcome of executing the actus reus was in fact to violate the law. See Dyer, 589 F.3d at 528 (describing a specific intent crime as one in which "the defendant specifically intended . . . [the proscribed] outcome as his purpose," or "purposefully and affirmatively desired [the proscribed] unlawful outcome"); see also Morissette, 342 U.S. at 265 (stating that a showing of "specific intent or purpose [] will require some specialized knowledge or design for some evil beyond the common-law intent to do injury."); Oduche-Nwakaihe v. Att'y Gen. of U.S., 363 F. App'x 898, 901 (3d Cir. 2010) ("Specific intent requires not simply the general intent to accomplish an act with no particular end in mind, but the additional deliberate and conscious purpose of accomplishing [the] specific and prohibited result." (quoting Pierre v. Att'y Gen. of U.S., 528 F.3d 180, 189 (3d Cir. 2008)) (internal quotation mark omitted in original)).

Notably, § 841(a)(1) is not a crime of general intent, but rather, of specific intent. See United States v. Pelletier, 666 F.3d 1, 11 (1st Cir. 2011); Dyer, 589 F.3d at 534 ("[I]n the drug-trafficking context, we have consistently held that to prove possession with intent to distribute in violation of 21 U.S.C. § 841, the government must establish that the defendant knowingly and intentionally possessed a controlled substance with specific intent to distribute."); García-Carrasquillo, 483 F.3d at 130.

Thus, the government shoulders the burden of establishing that the defendants here had the particular purpose of committing the unlawful act of narcotics distribution when in possession of the controlled substances. See Clark v. Arizona, 548 U.S. 735, 766 (2006) ("[A] defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged, including the mental element or mens rea." (internal citations omitted)). While there is evidence in the record to support the defendants' possession of controlled substances, no evidence supports the finding that their intent when receiving drugs from "the box" and planting them in their targets' residences was for any other purpose than fabricating false cases.

It is well-accepted that specific intent -- an intangible concept -- may be established by either direct or circumstantial evidence. See United States v. Cannon, 589 F.3d 514, 517 (1st Cir. 2009); United States v. DesMarais, 938 F.2d 347, 352 (1st Cir.

1991) ("Seldom can 'specific intent' be established by direct evidence . . . . [but it may] [n]evertheless . . . be demonstrated 'through the use of circumstantial evidence so long as the total evidence, including reasonable inferences, is sufficient to warrant a jury to conclude that the defendant is guilty beyond a reasonable doubt.'" (quoting United States v. Campa, 679 F.2d 1006, 1010 (1st Cir. 1982))). Given the challenges presented in proving an individual's subjective mental state, both this court and our sister courts have recognized that a specific intent to distribute controlled substances may be inferred from various factors. These factors include, among others, (1) the quantity of drugs in a defendant's possession,[37] (2) the purity of the drugs at issue,[38] (3) the quantity of cash on a defendant,[39] (4) the manner in which

---

[37] United States v. Cormier, 468 F.3d 63, 71 (1st Cir. 2006); United States v. Rivera-Ruíz, 244 F.3d 263, 269 (1st Cir. 2001); United States v. Latham, 874 F.2d 852, 862-63 (1st Cir. 1989) (collecting cases supporting the notion that "possession of large quantities of drugs justifies the inference that the drugs are for distribution").

[38] United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993).

[39] United States v. Ayala-García, 574 F.3d 5, 13 (1st Cir. 2009); United States v. Mangual-Santiago, 562 F.3d 411, 425 (1st Cir. 2009).

the drugs were packaged,[40] (5) the presence of drug paraphernalia,[41] (6) the lack of any evidence showing a defendant used or consumed the type of drug seized,[42] (7) the presence of firearms,[43] (8) a defendant's history of participation in drug distribution,[44] or (9) a combination of the above.[45] Notably, such precedent for

---

[40] Ayala-García, 574 F.3d at 13 (finding that "the packaging alone," consisting of ninety plastic cylinders of cocaine, forty-four plastic bags of cocaine, and fifty-six aluminum wrappings of heroin, "was strong circumstantial evidence that the drugs were intended for distribution"); García-Carrasquillo, 483 F.3d at 130 n.12.

[41] United States v. García, 983 F.2d 1160, 1165 (1st Cir. 1993); DesMarais, 938 F.2d at 352 (noting that "[a] reasonable inference of specific intent to distribute" was supported "by the presence of drug paraphernalia, including a triple beam scale, plastic baggies, and magazines with current marijuana prices"); United States v. Butler, 763 F.2d 11, 15 (1st Cir. 1985).

[42] See United States v. Andrade, 94 F.3d 9, 13 (1st Cir. 1996) (noting fact that defendant did not have any "implements" with which to smoke crack as factor supporting inference of intent to distribute).

[43] Cannon, 589 F.3d at 518; United States v. Rivera-Calderón, 578 F.3d 78, 94 (1st Cir. 2009).

[44] United States v. Landrau-López, 444 F.3d 19, 24 (1st Cir. 2006) (citing cases); United States v. Arias-Montoya, 967 F.2d 708, 712-13 & n.7 (1st Cir. 1992) (noting evidence of "continuous dealing" as relevant in assessing a defendant's intent regarding distribution); see also United States v. LePage, 477 F.3d 485, 489 (7th Cir. 2007).

[45] United States v. Shurn, 849 F.2d 1090, 1093 (8th Cir. 1988) ("The intent to distribute may be proven by either direct or circumstantial evidence and may be inferred from such things as the possession of a large quantity of a controlled substance, its high purity level, the presence of paraphernalia used to aid in the distribution of drugs, large sums of unexplained cash, and the presence of firearms.").

establishing a specific intent to distribute involves factors not present here.[46]   Although such cases and their corresponding principles remain relevant for purposes of our analysis, none fall into the more narrow factual scope of our case: police officers planting drugs in order to frame their marks and generate grounds justifying an arrest.

Here the evidence before the jury for purposes of proving an intent to distribute on the part of the defendants included witness testimony and audio and video recordings showing that defendants received controlled substances, brought them to targets' homes to plant them (thereby framing the victims and providing grounds for arrest), and almost immediately thereafter, seized the drugs and returned them to their place of storage so that the vicious conspiratorial cycle of false inculpation could repeat itself.  Described more succinctly, the evidence from which the government asked the jury to infer a specific intent to distribute was the officers' actual acts of physically moving controlled substances amongst themselves to perform and complete the act of planting.  Accepting arguendo that the officers' physical acts here of planting evidence constitute drug distribution, the only

---

[46]   The sole exception to this is that appellants here, as police officers, likely were equipped with firearms as they carried out their case fabrication schemes.  However, their being armed correlated to their capacity as police officers and not to a specific intent to further drug abuse or drug trafficking.  See, e.g., Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1148 ("Police officers carry guns . . . .").

evidence from which the jury could infer an intent to distribute was from the alleged act of distribution itself. I believe such a conclusion in this case presents a two-fold problem.

First, where specific intent is a distinct element of a crime (as here), such element must be proved separately from the actual commission of the crime itself. See, e.g., Morissette, 342 U.S. at 276 (noting that evidence showing defendant actually took property weighed towards whether defendant "conscious[ly] and intentional[ly]" committed the crime; "[b]ut that isolated fact is not an adequate basis on which the jury should find the criminal intent to steal or knowingly convert . . . . [w]hether that intent existed, the jury must determine, not only from the act of taking, but from that together with defendant's testimony and all of the surrounding circumstances"); United States v. Miles, 360 F.3d 472, 477 (5th Cir. 2004) ("[S]trict adherence to the specific intent requirement contained in the text of the . . . statute is important to ensure that only 'conduct that is really distinct from the underlying specified unlawful activity' is punished under th[e] provision." (quoting United States v. Brown, 186 F.3d 661, 670 (5th Cir. 1999))); United States ex rel. Vraniak v. Randolph, 261 F.2d 234, 237 (7th Cir. 1958) (where specific intent is an element of a crime, "the specific intent must be proved as an independent fact and cannot be presumed from the commission of the unlawful act"). Thus, even if the officers' case fabrication actions constituted

drug distribution as such, the government cannot rest upon this evidence alone to confirm whether the officers held the requisite statutory intent to distribute. Such evidence, while unquestionably relevant, still must be considered in light of the surrounding circumstances.

And secondly, the "surrounding circumstances" of this case consist of the highly disturbing practice of police officers fabricating cases by planting evidence. The officers' constant and unchanging intent -- including while driving to the targets' residences, entering their homes, and placing the controlled substances in a location for subsequent seizure -- was to create an illusion of law enforcement, that is, catching their victims in a seemingly illegal act, and using the illusion as a justification for an unlawful arrest. The controlled substances here were simply the officers' instrument of choice that they played to their victims' downfall.

The reality is that the officers could have selected from a variety of instruments -- swapping narcotics for firearms, ammunition rounds, or even endangered animals -- and still have held the same intent (fabricating a case against a target and creating grounds for their arrest) while performing the same physical acts of driving to a home, temporarily depositing their instrument-of-choice in a location, and subsequently retrieving it. I find this to be a noteworthy point.

In reviewing other precedent in which an intent to distribute has been inferred from varying factors such as drug quantity, drug purity, or presence of drug paraphernalia, a switching of drugs with another item would have changed the question of intent entirely. And yet here, if the officers could have executed the same acts with different objects (<u>i.e.</u>, not controlled substances) and still satisfied the same intent and achieved the same overall objective, I must ask: how can the officers have held the requisite intent to distribute controlled substances, if without such substances, their intent would have remained the same?

For the officers here to have held an intent to distribute, the court (as it has) would have to accept that an intent to physically pass, move, or pick-up a controlled substance is all that is needed to be shown to establish an intent to distribute under the 1970 Act. But this, in effect, emasculates the specific intent requirement of § 841(a)(1) such that the crime is degraded to one requiring only a general intent, an unacceptable result under established law. Were § 841(a)(1) the latter, then an intent to perform the <u>actus reus</u> of a crime would suffice for liability to attach. But as we have noted, the crime of possession with intent to distribute is one of specific intent requiring a specific <u>mens rea</u>. See <u>Pelletier</u>, 666 F.3d at 10; <u>see also</u> <u>Latham</u>, 874 F.2d at 863 (concluding district court's jury instruction

erroneously "permitted a finding of guilt if the defendant had a general intent to distribute cocaine" and noting that "essential elements" of the crime of possession with intent to distribute cocaine included possession, "either actually or constructively, . . . with a specific intent to distribute").

Having carefully considered the plain language of the statute, I fail to understand the majority's conclusion, the upshot of which dilutes a specific intent crime's mental state requirement to nothing more than a general intent showing. I thus turn to the Act itself for guidance. Though this court generally has recognized that "[t]he words of the statute are the first guide to any interpretation of the meaning of the statute . . . if the meaning is plain," we also have noted that this "maxim has inherent flexibility," as "[e]ven seemingly straightforward text should be informed by the purpose and context of the statute." Greebel v. FTP Software, Inc., 194 F.3d 185, 192 (1st Cir. 1999). The fact that the defendants' objective actions, when broken down to their most basic linguistic descriptive form, may be described as a "delivery" or "transfer" of drugs does not, for me, resolve the question of whether the officers held the requisite statutory intent to distribute such substances.

As the Supreme Court has recently noted, ceasing our statutory examination at a literal-reading-only point in the analytical roadway "would ignore the rule that, because statutes

are not read as a collection of isolated phrases, '[a] word in a statute may or may not extend to the outer limits of its definitional possibilities.'" Abuelhawa v. United States, 556 U.S. 816, 819-20 (2009) (alteration in original) (quoting Dolan v. U.S. Postal Serv., 546 U.S. 481, 486 (2006)); U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993) ("Over and over we have stressed that '[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" (alteration in original) (quoting United States v. Heirs of Boisdore, 49 U.S. 113, 122 (1849))). Thus, ever mindful that "[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis," Dolan, 546 U.S. at 486, I shift back into drive from my plain language stop and proceed onward down the statutory language analysis highway to determine whether an intent to fabricate cases equates to an intent to distribute.

## B. Statutory Purpose

Section 841 is contained in Chapter 13 (Drug Abuse Prevention and Control) of Title 21 (Food and Drugs) of the 1970 Controlled Substances Act. Before exploring the legislative history (which we typically turn to for purposes of understanding a statute's meaning), I turn to the historical context surrounding

enactment of the Controlled Substances Act.  See generally Branch v. Smith, 538 U.S. 254, 266-71 (2003) (considering historical context surrounding passage of the Voting Rights Act); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 589-615 (1977) (reviewing the same in assessing the legislative history of three congressional acts and their effect on the boundaries of the Rosebud Reservation in South Dakota).  This is a highly relevant backdrop to assessing Congress's intent in passage of the Act, as a large number of drug laws already were present on the legislative books preceding its enactment, raising the question as to why Congress needed to create the Act, what void in the then-existing drug laws the Act was intended to fill, and how it was different from other provisions Congress previously had relied upon to target the ever-growing drug menace.

### 1.  Historical Context

The Controlled Substances Act was the product of a decades-long battle of trying to curb the ever-rising tide of drug abuse and drug trafficking in the United States.  The Act, however, was not Congress's first swing at bat in attempting to combat the growing drug market.  Congress's efforts to erect legislative walls to control the flow of narcotics both into and within the United States, and to counter the social problems associated with drug

abuse and addiction, date as far back as the nineteenth century.[47]

A review of those laws pre-dating the Act reveals a plethora of legislation with two predominant targeting themes: (1) drug abuse and (2) drug trafficking

The turn of the century brought with it the rising popularity of patent medicines used to treat common ailments. These medicines, however, contained addictive ingredients (e.g., opium, morphine, and cocaine) and contributed to a growing population of addicts. To combat these sources of addiction, Congress enacted legislation, the Pure Food and Drugs Act of 1906, that required labeling of medicines and prohibited the manufacture or shipment of misbranded or adulterated drugs in interstate commerce.[48] The goal was to discourage consumption via public exposure of such medications' addictive and dangerous ingredients.

---

[47] In 1842, Congress placed opium on its tariff lists, viewing the narcotic as a source of government revenue. See Tariff of 1842 ("Black Tariff"), Act of Aug. 30, 1842, ch. 270, 5 stat. 548, 558; see also Thomas M. Quinn & Gerald T. McLaughlin, The Evolution of Federal Drug Control Legislation, 22 Cath. U. L. Rev. 586-90 (1972-1973) (hereinafter "Quinn & McLaughlin"). As opium smoking began infiltrating varying levels of society, new revenue brought with it new problems of drug abuse and addiction. Congress accordingly began tightening the means of general accessibility to the drug, placing high taxes on all imported smoking opium. Quinn & McLaughlin, at 590 (citing Act of July 12, 1862, ch. 163, 12 stat. 543, 548).

[48] Pure Food and Drugs Act of 1906, ch. 3915, 34 Stat. 768, repealed by Act of June 25, 1938, ch. 675, 52 Stat. 1059; see also Quinn & McLaughlin, at 590-91.

Subsequent years showed Congress taking more forceful steps to restrict and contain the flow of narcotics, whether into, out of, or within the United States,[49] and more narrowly target the

---

[49]  Between 1909 and 1914, the federal government banned the importation and exportation of smoking opium, see Opium Exclusion Act, Pub. L. No. 60-221, 35 Stat. 614 (1909), severely restricted the import of other forms of opium, see Narcotics Drugs Import and Export Act of 1914, Pub. L. No. 63-230, 38 Stat. 275 (repealed 1970), and heavily taxed opium's domestic production, see Harrison Narcotics Tax Act, ch. 1, 38 Stat. 785 (1914).

In 1922, Congress passed the Narcotic Drug Import and Export Act, Pub. L. No. 67-227, 42 Stat. 596 (1922), adding cocaine to the list of drugs banned from entry into the country.

In 1937, Congress passed the Marihuana Tax Act, which required participants in the marijuana distribution chain to register with the government and to pay a tax, both increasing federal control over the drug and creating at least a monetary deterrence for those seeking its purchase.  Pub. L. No. 238, 50 Stat. 551 (repealed 1970); see also Gonzales v. Raich, 545 U.S. 1, 11 (2005).  Also in the 1930s, Congress continued to tighten its controls over the increasing black market in illegal drugs, passing both the Informers Act, ch. 829, 46 Stat. 850 (1930) (authorizing payment of informers for violations of drugs laws), and the Vehicle Seizure Act, ch. 618, 53 Stat. 1291 (1939) (prohibiting the transport of narcotics in or by means of a vessel, vehicle, or aircraft).

Congress continued to break new ground in drug control in the 1960s.  Although it previously had focused on the flow of narcotics into the general public by targeting U.S. ports, in 1960 Congress enacted the Narcotic Manufacturing Act, Pub. L. No. 86-429, 74 Stat. 55 (1960) to control the quantities of narcotics actually manufactured within the United States.

Congress's last big move before enacting the Controlled Substances Act was its 1965 amendments to the 1906 Food, Drug and Cosmetic Act.  See Drug Abuse Control Amendments of 1965, Pub. L. No. 89-74, 79 Stat. 226 (1965).  These amendments expanded Congress's narcotics regulation into the realm of "dangerous drugs" depressants, stimulants, and hallucinogens), targeting all forms of their illicit traffic and imposing various administrative requirements on those involved in the production, sale, or disposal of such drugs.  See Quinn & McLaughlin, at 603-05.

problems of drug abuse and drug addiction,[50] all while adjusting its means of drug enforcement, shifting powers from the Department of Treasury and the Department of Health, Education, and Welfare, ultimately into the hands of the Department of Justice.[51]

_____

[50] By the late 1920s, Congress faced an ever-increasing population of addicts and drug abusers. One such rising population was addicts in prison. To target the increasing numbers, Congress passed the Porter Act in 1929, ch. 82, 45 Stat. 1085 (1929), which created two treatment centers to provide rehabilitative care for convicted addicts. Quinn & McLaughlin, at 599.

Another population of concern was young people. Following a Special Senate Committee on Organized Crime's study on the rising number of young addicts during the years 1946 through 1951, Congress increased penalties for narcotics violations both in 1951, see Boggs Act of Nov. 2, 1956, ch. 666, 65 Stat. 767 (repealed 1970), and again in 1956, see Narcotics Control Act of 1956, Pub. L. No. 84-728, 70 Stat. 567 (repealed 1970). See Quinn & McLaughlin, at 601-02.

In the 1960s, Congress again revamped its approach to addicts and passed the Narcotic Addict Rehabilitation Act, Pub. L. No. 89-793, 80 Stat. 1438 (1966). The Act expanded rehabilitative treatment from imprisoned addicts to those who voluntarily sought treatment for their illness.

[51] The Department of Treasury originally served as the government's main enforcer against the drug market, with Congress creating the Prohibition Bureau of the Department of Treasury in 1927. See Quinn & McLaughlin, at 599; see also Raich, 545 U.S. at 10. In 1930, as enforcement needs grew, a separate agency was created, the Federal Bureau of Narcotics. See id.; see also Act of 1927, ch. 348, 44 Stat. 1381 (1927).

Congress's focus in the 1960s on dangerous drugs caused the Food and Drug Administration ("FDA") of the Department of Health, Education, and Welfare ("HEW") to step in and create the Bureau of Drug Abuse Control. See Quinn & McLaughlin, at 605. By 1968, jurisdiction over dangerous drugs officially was transferred from the FDA to the Department of Justice, see Reorganization Plan No. 1 of 1968, § 2(a), 28 U.S.C. § 509 (1970), signifying a merger of both the Department of Treasury's Bureau of Narcotics and the HEW's Bureau of Drug Abuse Control.

Although Congress enacted various laws to target both drug trafficking and drug abuse throughout the early to mid-twentieth century, the main drug control law before Congress's passage of the Controlled Substances Act was the Harrison Narcotics Act of 1914, ch. 1, 38 Stat. 785 (repealed 1970). The Act signified the government's firm interjection of itself into the darker realm of narcotics trafficking in the United States, implanting methods of federal control and regulation that endured until the 1970 consolidation of the drug laws.

The Harrison Act served two principal purposes: (1) it created a federal watchdog system whereby the trafficking in narcotics was surveilled from the drugs' date of entry or manufacture until their time of consumption, and (2) it established criminal penalties for drug trafficking that occurred outside legally authorized entities, persons, or chains. See generally 38 Stat. 785; United States v. Doremus, 249 U.S. 86, 90-95 (1919) (discussing Harrison Act's regulation of drugs and upholding the Act on grounds that it did not exceed Congress's tax powers). The Harrison Act thus affirmatively placed a fork in the drug marketing road -- which has remained firmly planted ever since -- dividing the flow of narcotics between two distinct paths, the high (legal) road, and the low (illegal) road. The Harrison Act directed such narcotic traffic by requiring manufacturers, producers, dispensers, distributors, and purchasers of drugs to both register with the

government and to pay a special occupational tax.  See Quinn &

McLaughlin, at 593; see also Raich, 545 U.S. at 10-11.  Any type of

sale, transfer, or exchange of drugs could only occur following a

written order -- limited to execution on documents specifically

provided by the Commissioner of Internal Revenue -- made by the

person receiving such drugs.  See Quinn & McLaughlin, at 593-94.

Lastly, strict record-keeping requirements were imposed on anyone

involved in the drug distribution system, allowing Congress to

maintain a vigilant eye over both the drugs themselves and their

corresponding transferors and recipients.

Notably, the Harrison Act's efforts to target the illicit

drug market -- by casting light on all types of transfers and

participants in the drug distribution system -- had the unfortunate

effect of pushing illegitimate transactions further into the

shadowy realms beyond the reach of the law, with black market

transactions thriving, like mushrooms, in the darkness.[52]  After a

---

[52]  An effect of the Harrison Act that one commentator has noted is
tied into section 2 of the Act, which exempted from coverage the
dispensing or distribution of drugs "to a patient by a
physician . . . in the course of his professional practice," ch. 1,
§ 2(a), 38 Stat. 785, at 786 (1914).  The upshot of the provision,
however, was a wave of patient-addicts seeking "legal"
administration of a drug from their doctor.  See, e.g., United
States v. Behrman, 258 U.S. 280 (1922); Jin Fuey Moy v. United
States, 254 U.S. 189 (1920); Webb v. United States, 249 U.S. 96
(1919).  As courts tightened up on those medical treatments they
deemed to fall within the legal provisions of the Harrison Act,
addicts, being increasingly forced out of doctors' offices, sought
a new supply in the black market.  And so, "[t]he addict-patient
vanished; the addict-criminal emerged in his place."  Rufus King,
The Drug Hang-Up: America's Fifty-Year Folly 43 (1974).

patchwork of laws directed at targeting drug trafficking and drug abuse, the narcotics theme took full and center governmental stage with President Nixon's assumption of the presidency in 1969.

President Nixon's famous declaration of a "war on drugs" led to a complete transformation of the drug policy playing field.[53] Congress sought to create legislation "that would consolidate various drug laws on the books into a comprehensive statute, provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels, and strengthen law enforcement tools against the traffic in illicit drugs."  Raich, 545 U.S. at 10; see also id. at 12 ("[P]rompted by a perceived need to consolidate the growing number of piecemeal drug laws and to enhance federal drug enforcement powers, Congress enacted the [Controlled Substances Act]").  And so the historical marathon of legislation came to a rest and the Comprehensive Drug Abuse Prevention and Control Act of 1970 came into being, consisting of three titles: Title I, addressing the prevention and treatment of narcotic addicts; Title II (most relevant for purposes of this appeal), addressing drug control and enforcement; and Title III, addressing the import and export of controlled substances.  84 Stat. 1238, 1242, 1285.

---

[53]  See D. Musto & P. Korsmeyer, The Quest for Drug Control: Politics and Federal Policy in a Period of Increasing Substance Abuse (1963-1981) 60 (2002).

## 2. Legislative History

The legislative history of the Controlled Substances Act reveals that Congress transferred its same twofold intent as had existed in prior legislation, namely, targeting drug abuse and drug trafficking, into its passage of the 1970 Act. The Report of the Senate Judiciary Committee on the Controlled Substances Act of 1969 states that "[t]he control of drug abuse and of both the legitimate and illegitimate traffic in drugs is the main objective of the bill." S. Rep. No. 91-613, at 4 (1969) (emphasis added). The House Committee Report on the bill similarly notes that the Act was intended to unite in a single statute the prior "plethora of legislation" targeting drug offenses, bringing together the "more than 50 pieces of legislation" that previously had targeted the twin evils of drug abuse and drug traffic and that had led to "a confusing and often duplicative approach to control of the legitimate industry and to enforcement against the illicit drug traffic." H.R. Rep. No. 91-1444, 4571 (1970).[54] Additionally, the

_____

[54] The House Committee Report describes the Controlled Substances Act's purpose as:

> to deal in a comprehensive fashion with the growing menace of drug abuse in the United States (1) through providing authority for increased efforts in drug abuse prevention and rehabilitation of users, (2) through providing more effective means for law enforcement aspects of drug abuse prevention and control, and (3) by providing for an overall balanced scheme of criminal penalties for offenses involving drugs.

H.R. Rep. No. 91-1444, at 4567 (emphasis added).

House Committee Report breaks the soon-to-be Act into three provisions, Title I (focusing on drug abuse), and Titles II and III (focusing on drug trafficking), the division of which further reaffirms Congress's twofold objective.[55]

Exploration into the legislative history additionally reveals the following regarding Congress's intent in passing the Controlled Substances Act.

### a. Drug Abuse

The legislative history confirms that Congress intended to maintain its focus on drug abuse. Specifically, Congress sought to define those drugs of interest, focusing on their "abuse potential, and psychological and physical effects," using such categorizations as a basis for creating penalties that corresponded with the severity of a substance's abuse potential. H.R. Rep. No. 91-1444, at 4571; 4575-77; 4599-605; see also Touby v. United States, 500 U.S. 160, 162 (1991) ("Violations involving schedule I substances carry the most severe penalties, as these substances are

---

[55]  Specifically, Title I focuses on the problem of drug abuse, i.e., drug addiction and forms of rehabilitation, treatment, and prevention. See H.R. Rep. No. 91-1444, at 4568-69 (describing Title I as "establish[ing] rehabilitation programs relating to drug abuse," and increasing "efforts in the rehabilitation, treatment, and prevention of drug abuse").  Titles II and III aim at drug trafficking, both within and outside of the United States. See Raich, 545 U.S. at 12 (stating Title II "repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs."); see also H.R. Rep. No. 91-1444, at 4571 (noting Title III "provides for control of imports and exports of drugs subject to abuse . . . with criminal penalties for transactions outside the legitimate chain").

believed to pose the most serious threat to public safety."); United States v. Moore, 423 U.S. 122, 132 (1975) (noting that "[i]n enacting the CSA Congress attempted to devise a more flexible penalty structure than that used in the Harrison Act," with penalties "geared to the nature of the violation, including the character of the drug involved"); see also Gonzales v. Oregon, 546 U.S. 243, 273-74 (2006). Congress's consideration of the physical and mental effects substances could have on an individual required it to acknowledge those drugs capable of inciting dependency and awakening new addict populations, the latter of which could further foster incidents of drug trafficking. H.R. Rep. No. 91-1444, at 4573-74; 4592-95; 4599-605. Congress's review of various substances' addictive natures for purposes of categorization, determination of corresponding penalties based on their "abuse potential," and concern with recurring drug abuse's effects on the individual, further reaffirm Congress's intent to target drug abuse under the Act, with drug abuse being equated with drug addiction. See Oregon, 546 U.S. at 273 (noting the Controlled Substances Act "consistently connect[s] the undefined term 'drug abuse' with addiction or abnormal effects on the nervous system").

### b. Drug Trafficking

The legislative history also confirms Congress's directed aim at drug trafficking, both legitimate and illegitimate. See Moore, 423 U.S. at 134-35 ("The legislative history [of the

Controlled Substances Act] indicates that Congress was concerned with the nature of the drug transaction . . . . [and] with the diversion of drugs from legitimate channels to illegitimate channels."). For instance, the House Committee Report states the Act's goal of "reduc[ing] the availability of drugs subject to abuse except through legitimate channels of trade and for legitimate uses". H.R. Rep. No. 91-1444, at 4574; see also id. at 4569 (same); id. at 4571-72 (same); id. at 4589 (same); id. at 4590 (acknowledging that "law relating to the regulation of narcotics provides a closed system" of such drugs, making it "possible to keep diversions of narcotic drugs from legitimate channels of trade to an almost irreducible minimum"); id. at 4607 (noting the importance of maintaining "effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels").

Additionally, the Senate Judiciary Committee Report on the Controlled Substances Act of 1969, containing parallel provisions to those ultimately included in the 1970 Act, echoed that bill's aim at "both the legitimate and illegitimate traffic in drugs," S. Rep. No. 91-613, at 4, its section 502 as providing "additional penalties . . . for those involved in the legitimate drug trade for illegal" trafficking, and its section 503 as applying "[f]urther penalties . . . for registrants for illegal distribution," id. at 9. The Senate's Report further posits that

"[a]pprehension of the serious traffickers and illicit manufacturers of drugs is probably the most effective way to control the drug problem." Id. at 10. This language from both reports confirms Congress's goal of distinguishing between legitimate versus illegitimate drug trafficking, and, via its legislative arm, creating channels with which to divert the movement of drugs away from illegitimate streams and into legitimate waters.

Regarding the Act's aim at drug trafficking, we also observe these points. First, the legislative history repeatedly distinguishes between legitimate versus illegitimate forms of trafficking. See, e.g., H.R. Rep. No. 91-1444, at 4569 (distinguishing between members of the "legitimate distribution chain" and those "outside the legitimate distribution chain"); id. at 4571 (distinguishing between "the legitimate industry" and "enforcement against the illicit drug traffic"); id. at 4572 (same); id. at 4574 (describing a reduction in drug availability subject to abuse "except through legitimate channels of trade and for legitimate uses"); id. at 4584 (same); id. at 4589 (same); id. at 4590 (same); id. at 4601-02 (same); id. at 4606-07 (same).

Second, the legislative history indicates that legitimate "channels" or "markets" or "distribution chains" generally are determined by whether or not the participants are registered or authorized manufacturers, wholesalers, retailers, or users of

narcotics, i.e., market participants; if they are not, then they fall outside the legitimate realm and into the "illicit market" category. See H.R. Rep. 91-1444, at 4569 (stating the bill requires "registration of manufacturers, wholesalers, retailers, and all others in the legitimate distribution chain, and makes transactions outside the legitimate distribution chain illegal"); id. at 4589 (same); id. at 4602 (same); id. at 4605-06 (same); S. Rep. No. 91-613, at 6 (same).

Third, Congress's imposed registration requirements serve not only to verify whether a participant is involved in the legitimate or illicit drug market, but also, to ensure Congress's watchful gaze over each controlled substance and its respective movements to try and further curtail drug abuse and its associated problems. See H.R. Rep. No. 91-1444, at 4569 (noting registration of manufacturers, wholesalers, retailers, and others in legitimate distribution chain meant to ensure "control by the Justice Department of problems related to drug abuse").

Fourth, legislative history links participation in drug distribution with participation in the drug market or drug industry. Specifically, the legislative history indicates that Congress sought to create a "closed system" of drug manufacturing, distribution, and dispensing that (ideally) would lead to a diminishment -- if not extinction -- of the illicit drug market. See H.R. Rep. No. 91-1444, at 4571-72 ("The bill is designed to

-96-

improve the administration and regulation of the manufacturing, distribution, and dispensing of controlled substances by providing a 'closed' system of drug distribution for legitimate handlers of such drugs" that would "significantly reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing [for a] legitimate drug industry . . . ."); see also id. at 4574.

Similarly, Congress connects the flow of controlled substances with its effect on commerce, again effectively linking drug distribution with the drug market. See H.R. Rep. No. 91-1444, at 4596 ("Controlled substances either flow through interstate or foreign commerce or they have a substantial and direct effect upon interstate commerce . . . ."); id. ("Those substances manufactured or distributed on a purely intrastate basis cannot be differentiated from those manufactured or distributed for interstate commerce . . . .").

In sum, the legislative history on trafficking reveals that Congress intended to target both legitimate and illegitimate drug trafficking; legitimate trafficking correlates with drug movement through legitimate "channels" or "distribution chains;" the key players in a "legitimate channel" or "legitimate distribution chain" consist of registered manufacturers, wholesalers, retailers and the like; registration serves the dual purpose of enabling effective monitoring of all legitimate drug

transfers and further curbing incidents of drug abuse through careful surveillance; Congress connects drug distribution, whether via registered or unregistered entities, with participation in the drug market, whether licit or illicit; and it lastly links any such participation in the drug market with a potential for drug abuse and its corresponding problems.

It is thus beyond cavil that the object and intent of the Controlled Substances Act was the control of drug abuse and drug trafficking. With this legislative framework in mind, I return to the facts of our case.

## C. Back to the Facts

The evidence adduced at trial revealed that the officers' intent at all times while handling the controlled substances was to fabricate a case against a given mark. Specifically, the evidence (consisting of testimony from cooperating witnesses and audio and video recordings) showed that all controlled substances were kept in the care and custody of Santiago. Santiago only accessed the box, or allowed others to so access the box, when officers were planning to execute a search warrant or perform another form of police intervention potentially leading to arrest. Officers who received the controlled substances did so with specific instructions to make any search or intervention turn out "positive" through the use of planted drugs. The officers only use of the drugs consisted of going to a location in which the target was

-98-

located, planting the evidence, and using it as grounds for a seemingly lawful arrest. All drugs were then immediately returned to the black box, to a co-conspirator's control, or, if there was more than one search or intervention in a given day, used again in the same manner to falsify grounds for a mark's arrest.

Thus, taken together, the evidence shows that the one sole, consistent purpose motivating the officers' actions and collective scheme was to falsify cases against certain targets by means of planting evidence, with controlled substances serving as their weapon of choice, and to retrieve and store the drugs once they no longer were being used for such falsification purposes.[56]

---

[56] Even the government's framing of the officers' intent in its indictment reveals the same purpose. In its "Object of the [Count Two] Conspiracy" section, the government states:

> It was the object of the conspiracy to possess with the intent to distribute controlled substances <u>in the fabrication of cases against individuals in the Commonwealth of Puerto Rico</u> in order <u>to further the object of the conspiracy contained in Count One of this indictment</u>.

(Emphasis added).

The government describes the object of the count one conspiracy as "[t]o plant illegal controlled substances on or near persons in the Commonwealth of Puerto Rico," and "[t]o swear out false search warrant affidavits against persons in the Commonwealth of Puerto Rico," both of which resulted in "the unreasonable seizures and unlawful detentions and arrests of these persons."

In its charging of the "Manner and Means" the officers' used to effectuate the object of their count two conspiracy, the government provides:

> The foregoing object of the [Count Two] conspiracy was to

Their intent was never to consume (or try and make others consume) the narcotics or use the drugs in a way that raised a potential for addiction (*i.e.*, drug abuse), nor was their objective to introduce or circulate the drugs into society's illicit drug market channels (*i.e.*, drug trafficking).[57]

---

be accomplished as follows:

1.    Defendants and other uncharged co-conspirators would use their status as sworn officers of the POPR Mayaguez Drug/Narcotics/Vice Unit <u>to retain controlled substances</u> seized at various times during the conspiracy <u>in order to use these controlled substances to fabricate cases against individuals in the Commonwealth of Puerto Rico</u>.

2.    The defendants and other uncharged co-conspirators would share these controlled substances amongst themselves <u>in order to assist each other in carrying out the objects of the conspiracy contained in Count One of this Indictment</u>.

(Emphasis added).

[57] As to this last point, the only recipients of the drugs in the planting scheme were police officers; their victims never had any knowledge as to the drugs' presence on their property, and though the victims may have had questionable legal backgrounds, they still never consented or willingly participated in receipt of the controlled substances for which the officers arrested them. Contrary to the majority's insinuation, simply because the officers' victims may have engaged in drug deals in the past does not mean that the officers' leaving of drugs on the targeted drug leaders or dealers' properties constituted an insertion of drugs into an illicit channel at the particular time of planting. <u>See</u> Maj. Op. at 46 n.26 ("The evidence is that the officers did intend to introduce the drugs into society's illicit channels . . . . Indeed, the evidence shows that the officers repeatedly transferred the drugs to known drug leaders and dealers, often leaving drugs somewhere on the drug dealer's property so that the drugs would be 'discovered' by other officers."). In fact, the drugs never left the control or authority of the police officers, who at the time of planting, already were in the process of searching a victim's home, with their targets accordingly seized and under their authority

Courts, including ours, have consistently recognized Congress's intent to broadly target ever-evolving forms of drug transactions through enactment of the Controlled Substances Act and its coinciding provisions.[58]  Moreover, the legislative history makes clear that Congress's goal in enacting the Controlled Substances Act was to target drug abuse and drug trafficking, and that §§ 841(a)(1) and 846 were two such widely-sweeping provisions through which Congress intended to prevent, or at least control, either of such double troubles from happening or increasing in occurrence.  However, the fact that Congress intends a law to apply broadly does not mean that it or its corresponding provisions are limitless in application.

It is axiomatic that the law presumes men intend the natural consequences of their actions, but this presumption fails where the evidentiary mirror reflects an intent different from that required under the statute.  Pico v. United States, 228 U.S. 225, 231 (1913); McDonald v. United States, 9 F.2d 506, 508 (8th Cir. 1925) ("While it is a fundamental rule that men are presumed to

---

during the execution of the search.

[58]  See, e.g., United States v. Wallace, 532 F.3d 126, 129 (2d Cir. 2008) (noting that the terms "distribute" and "deliver" reflect a congressional intent "'to proscribe a range of conduct broader than the mere sale of narcotics'" (quoting United States v. Washington, 41 F.3d 917, 919 (4th Cir. 1994))); United States v. Tingle, 183 F.3d 719, 727 n.3 (7th Cir. 1999) ("Courts usually interpret the term 'distribution' and related words quite broadly."); United States v. Pruitt, 487 F.2d 1241, 1245 (8th Cir. 1973).

intend the natural consequences of their acts, yet this presumption cannot prevail in the presence of positive proof of a specific intent different from that required by the statute."). In such instances, "it devolves upon the government to present affirmative evidence of the existence of the required unlawful intent" essential to the crime charged. McDonald, 9 F.2d at 508.

In my view, the government's evidence falls short of the requisite specific intent mark for us to affirm appellants' convictions for violating 21 U.S.C. §§ 841 and 846. See United States v. Feola, 420 U.S. 671, 686 (1975) ("[T]o sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself."); Ingram v. United States, 360 U.S. 672, 678 (1959). The officers' specific intent under the facts of this case does not equate with the dual objects which Congress has historically pursued in its controlled substances legislation and on which it set its legislative eyes in the passage of the 1970 Act and the corresponding provisions of §§ 841(a)(1) and 846: drug abuse and drug trafficking.[59] See

[59] The majority takes issue with my contention that Congress's goal in enacting the Controlled Substances Act, and in particular, § 841(a)(1), was to target the double evils of drug abuse and drug trafficking. The majority itself, however, seems to concede the relevance of such factors in its discussion of why it claims I mistake overall objective for specific intent. Specifically, the majority discusses United States v. Boidi, 568 F.3d 24 (1st Cir. 2009). But the language cited by the majority to support its understanding of the term "distribute" and its corresponding intent

<u>Oregon</u>, 546 U.S. at 268 (referring to the Controlled Substances Act's "statutory purposes to <u>combat drug abuse</u> and <u>prevent illicit drug trafficking</u>" (emphasis added)); <u>Raich</u>, 545 U.S. at 12 (stating "[t]he main objectives of the [Controlled Substances Act] were <u>to conquer drug abuse</u> and <u>to control the legitimate and illegitimate traffic in controlled substances</u>") (emphasis added); <u>United States</u> v. <u>Pumphrey</u>, 831 F.2d 307, 309 n.3 (D.C. Cir. 1987).

## III.

After a thorough search, I have been unable to find any decision, reported or otherwise, in which an individual has been charged or convicted for violation of the statutes as charged under count two, nor has the majority (or the parties, for that matter) pointed to any such decision or precedent.[60]  The absence of any precedent since the Controlled Substances Act's enactment in which a person has been charged (much less convicted) for possession of controlled substances with an intent to distribute -- where the

---

-- <u>i.e.</u>, "[w]hether or not sharing [drugs] with a girlfriend is often so prosecuted, it is as much 'distribution' as selling it on a street corner," Maj. Op. at 36 (quoting <u>Boidi</u>, 568 F.3d at 29) -- still reflects what I believe were Congress's twin goals in enacting the underlying statute and the focal points at which it intended to direct the statute's aim: drug abuse (the girlfriend's consumption of the drugs) and drug trafficking (selling on the street corner).

[60]  Those cases cited by the majority in footnote 25 as alleged support for the contrary conclusion do not persuade otherwise; rather, such cases concern classic acts of drug distribution (involving either drug abuse or drug trafficking), actions which the history of this legislation clearly prohibits.

only proffered evidence was the individual's planting of drugs with the specific purpose to frame others -- I find to be highly compelling. Though the majority brushes this lack-of-precedent contention aside on grounds of prosecutorial discretion and claiming that a scarcity of precedent "says nothing about the incidence rate of similar misconduct . . . and nothing about whether similar prosecutions were brought but did not result in reported decisions," Maj. Op. at 43, I respectfully take issue with its more cavalier response to what I believe is a relevant point.[61]

   To begin with, I flag this concern not because I believe it may reasonably be contended that the underlying acts of planting at issue here never have taken place before, nor because I believe we hold the power to invalidate a conviction solely on the basis of whether a track record of such prosecutions in the past exists. See Maj. Op. at 44. As to the former point, though one would hope such incidents are few and far between, I am not so naive as to think that past police misconduct has never encapsulated such condemnable acts. And to the latter, I raise this lack-of-precedent point solely to reinforce my contention that the

---

[61]  Though the majority finds this dearth of law an unpersuasive point, when challenging my contention (based on the Controlled Substances Act's legislative history) that a specific intent to distribute drugs should somehow trigger or implicate Congress's twin goals of targeting drug abuse or drug trafficking, the majority cites to a lack of precedent to support its position that such factors are not part of the analysis for assessing specific intent under § 841.  Maj. Op. at 46.

distribution statutes at issue -- 21 U.S.C. §§ 841(a)(1) & 846 -- are not the appropriate tools with which to tackle the opprobrious charges underlying count two (i.e., that possessing drugs with an intent to fabricate cases against targets is equivalent to possessing drugs with the specific intent to engage in drug distribution).  Notably, the acts of case fabrication at issue, clear violations of individuals' civil rights, are not without remedy -- they unquestionably fall, as evidenced supra, within the ambit of other statutes enacted by Congress, with 18 U.S.C. § 241 serving as one of the weapons it more commonly uses to target such acts of civil rights infringement.[62]

Moreover, I find it quite telling that the government deemed this dearth of supporting precedent a relevant factor when deciding which charges it properly could bring in this case. Specifically, the government at oral argument explained that, when initially preparing the indictment in this case, "the Department" (which I presume to mean the Department of Justice) sent out an agency-wide email requesting the respective views of all other "offices" (which I assume refers to all other U.S. Attorney offices), as to whether the officers in this case could be charged with possession with intent to distribute for their underlying acts

---

[62]  For this reason, I take no issue with the majority's point that officers lawfully engaged in drug distribution are shielded from liability pursuant to 21 U.S.C. § 885(d), but that those who unlawfully participate in such acts may have their cloaks of immunity pierced.  See Maj. Op. at 37-40.

of police misconduct. The government conceded that its broad conferral revealed no consensus whatsoever from the Department as to whether such acts fell within the ambit of 21 U.S.C. § 841(a)(1). Nevertheless, despite this lack of consensus, the Puerto Rico office decided to proceed.

At the very least, the fact that no other judgment has been issued sustaining the government's novel interpretation of an intent to distribute as including an intent to falsify cases through planting evidence supports my concern that such a reading does not fall within Congress's intended purview of § 841's possession-with-intent-to-distribute proscription. Indeed, it borders on the preposterous to conclude that out of ninety-three U.S. Attorney Offices in the United States, only the Puerto Rico office has not been derelict in charging under the law in question, and that the remaining offices have apparently been blind to what the majority believes was a clear proscription of the law since its 1970 enactment. Tragic a statement as it may be, the District of Puerto Rico is not the only jurisdiction in which rogue police officers exist. This is a regrettable, unfortunate fact of which we could almost take judicial notice. But charging under a statute for conduct of which no prior precedent exists may, in some instances, be a form of rogueness which this court should not sanction; indeed, such potential overreaching raises constitutional

red flags that I fear may fly in future cases before this court.[63]

## IV.

To be clear, any abuse of the authoritative badge is reprehensible and an indignity to the very laws the badge is charged with upholding. But I simply cannot accept the government's -- and now majority's -- novel position that an intent to fabricate cases and falsify arrests is tantamount to an intent to commit drug distribution. Although I do not question prosecutors' accepted discretion to pick and choose among those statutes it deems most applicable to the crimes and charges at issue, such power is not absolute, particularly where the evidence does not support the crime charged. This is such a case. I thus would reverse the convictions of appellants Santiago, Cortés, and Domínguez under count two and remand their cases for resentencing based only on the count one conviction. For this reason, I likewise dissent to Parts II.C.1 and II.C.2 of the opinion.

---

[63] The government's novel proposal to interpret and enforce §§ 841(a)(1) and 846 in this radically new manner could prove constitutionally problematic. See U.S. Const. amend. XIV; Kolender v. Lawson, 461 U.S. 352, 357 (1983) (stating "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement"); see also Clark v. Martínez, 543 U.S. 371, 381-82 (2005) (canon of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").